**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| Bunthoeun Kong, | ) ) ) | **CASE NO:** |
| Plaintiff, | ) ) ) |  |
| vs. | ) ) |  |
| United States, | ) ) |  |
| Defendant. | ) ) |  |

**CIVIL ACTION COMPLAINT**

*INTRODUCTION*

1.  Early in the morning on April 17, 2018, officers from U.S. Immigration and Customs Enforcement ("ICE") arrested Plaintiff Bunthoeun Kong without any advance warning, as Mr. Kong was driving away from his home and on his way to work.

2.  Following the arrest, ICE held Mr. Kong at various detention facilities for approximately two months – until ICE released Kong after he filed a petition for writ of habeas corpus which challenged the lawfulness of his detention.

3.  At the time of his arrest, Mr. Kong had been living in the United States for nearly eighteen years under an order of supervision which permitted him to live lawfully in the United States – despite his receipt of a deportation order in 1996 – because the government of Cambodia, Kong's country of origin, had refused to repatriate him.

4.  At the time of his arrest, ICE had no new information about Mr. Kong in its possession to suggest that Cambodia would repatriate Kong and the purpose of the arrest was to

1

facilitate Kong's interview by the government of Cambodia, to re-determine whether repatriation to Cambodia was an option.

5. At the time of his arrest, Mr. Kong had – and still has – a wife and three children, all of whom are United States citizens and for whom Kong was the primary breadwinner.

6. At the time of his arrest, Mr. Kong had carefully complied with the terms of his supervision order and had been gainfully employed with the same medical supply manufacturer for approximately thirteen years, a position which Kong lost because of his arrest and subsequent detention by ICE.

7. At no time prior to his arrest did Mr. Kong receive notice from ICE concerning the agency's desire that he be interviewed by the Cambodian government so as to reevaluate whether Kong was a candidate for repatriation.

8. At no time after his arrest did Mr. Kong receive an opportunity from ICE to dispute the propriety of his arrest – that is, why Kong believed that Cambodia would not repatriate him or why Kong should be trusted to present himself voluntarily to any interview scheduled with the Cambodian government.

9. Not until approximately one month after Mr. Kong had been arrested, following Mr. Kong's detained interview with the Cambodian government, did ICE provide Kong with any information about how he could challenge the propriety of his ongoing detention.

10. Only after Mr. Kong filed a petition for writ of habeas corpus challenging the lawfulness of his detention did ICE release Kong.

11. By this action, Mr. Kong seeks to recover from the United States monetary damages arising from Kong's unlawful arrest and detention by ICE as well as ICE's corresponding violations of Kong's civil rights.

*JURISDICTION & VENUE*

12. The U.S. District Court for the District of Massachusetts has jurisdiction to adjudicate the present action pursuant to Section 1346(b) of United States Code Title 28.

13. The U.S. District Court for the District of Massachusetts is the proper venue to hear this action, pursuant to Section 1402(b) of United States Code Title 28, because Mr. Kong presently resides within the Commonwealth of Massachusetts.

*PARTIES*

14. Mr. Kong is a national of Cambodia and resident of Lynn, Massachusetts who immigrated to the United States in 1982 as a child seeking refuge from war and who had been living in the United States from June of 2000 through April of 2018 under an order of supervision ("2000 Order of Supervision") first administered by the legacy Immigration and Naturalization Service ("INS") and then by ICE.

15. The United States is the proper Defendant in this action, pursuant to Section 2679(b) of United States Code Title 28, insofar as Mr. Kong seeks redress for injury, loss of property or personal injury which arose from the wrongful acts of ICE agents or employee while acting within the scope of their respective office or employment.

*FACTS*

16. Mr. Kong was born in Battambong, Cambodia in 1973.

17. During Mr. Kong's childhood, Cambodia experienced serious military conflict which caused Kong's family to flee the country.

18. In 1982, Mr. Kong – then a young child – immigrated to the United States as a refugee with his parents and four siblings.

19. After immigrating to the United States, Mr. Kong's family ultimately settled in California.

20. As a young man, Mr. Kong struggled to adapt to his new environment and experienced great difficulty in school.

21. Around the time Mr. Kong was nineteen-years-old, he was still taking high school classes in the tenth grade.

22. During that time, Mr. Kong got into trouble with the law – for criminal conduct involving drugs as well as an assault – and was ultimately incarcerated by the State of California.

23. In 1995, while incarcerated, Mr. Kong earned his High School Equivalency Certificate.

24. In 1996, the Executive Office for Immigration Review ("EOIR") ordered Mr. Kong to be deported to Cambodia.

25. Accordingly, when Mr. Kong was released from incarceration by the State of California, he was detained by INS pending his deportation to Cambodia.

26. However, at that time, Cambodia did not accept Mr. Kong for repatriation.

27. According to INS paperwork Mr. Kong received in 1999, INS believed his "removal from the United States [was] not possible or practicable."

28. In or around September of 1999, INS interviewed Mr. Kong as a candidate for possible release back into society and, in approximately October of that same year, recommended Kong for release upon his completion of the About Face Program – an intensive nine-month rehabilitation program focusing on self-discipline, counseling, therapy and behavior modification.

29. Mr. Kong completed the About Face Program and, in June of 2000, INS released Kong back into society pursuant to the 2000 Order of Supervision – which placed various obligations upon Kong, such as to report periodically to INS, to cooperate with INS efforts to effect his repatriation and to limit his travel.

30. When Mr. Kong left INS custody, he had been either incarcerated or detained for most of his adult life and had spent approximately four years in immigration detention.

31. Following his release from INS custody, Mr. Kong settled in Lynn, Massachusetts where his family had since relocated and where he married his wife, who is a United States citizen.

32. Following his release from INS custody, Mr. Kong found a job at Allen Medical – a medical supply manufacturer located in Acton, Massachusetts – where he worked for thirteen years, first as an assembler and for the last ten years as a team lead.

33. Following his release from INS custody, Mr. Kong built a family, fathering three children who are United States citizens, two of whom are of school-age and one of whom is a toddler.

34. Following his release from INS custody, Mr. Kong stayed out of trouble, engaged in no criminal conduct and carefully followed the terms of the 2000 Order of Supervision.

35. Following his release from INS custody, Mr. Kong acted as the primary breadwinner for his family, supporting not only his wife and children but also his wife's disabled mother – who lives with Kong's family – as well as providing monetary assistance to his aged parents.

36. Despite his model behavior, on April 17, 2018, approximately eighteen years after his release from INS custody and without any warning, ICE officers arrested Mr. Kong early in

the morning as he was leaving for work – without a warrant and for the purpose of facilitating Kong's interview with the government of Cambodia so that Cambodia could re-determine if it would repatriate Kong.

37. At the time of Mr. Kong's arrest, ICE had no new information specific to Mr. Kong that could lead it to believe that the Cambodian government would repatriate Kong or that would otherwise justify his arrest and subsequent detention.

38. At the time of Mr. Kong's arrest, ICE had not provided Mr. Kong with any notice that it was planning to arrest Kong or that it wished him to participate in an interview with the Cambodian government.

39. Indeed, in December of 2017, Mr. Kong had reported to the ICE Field Office in Burlington, Massachusetts for his annual check-in, just as he had consistently done in the past, and during that visit no one informed Kong of the agency's desire that he be interviewed by the Cambodian government or of the agency's intention to detain Kong to facilitate the interview.

40. Moreover, in February of 2018, Mr. Kong again reported to the to the ICE Field Office in Burlington, in response to ICE's request that he return to complete additional paperwork, and during that visit no one informed Kong of the agency's desire that he be interviewed by the Cambodian government or of the agency's intention to detain him to facilitate that interview.

41. At no time after his arrest did Mr. Kong receive an opportunity from ICE to dispute the propriety of his arrest – that is, why Kong believed that Cambodia would not repatriate him or why Kong should be trusted to present himself voluntarily to any interview scheduled with the Cambodian government.

42. Following Mr. Kong's arrest, ICE immediately detained Kong and transported him to various facilities in Massachusetts and Pennsylvania but failed to provide Kong with any information about why he had been arrested until approximately four days before Kong's interview with the Cambodian government, while Kong was detained in Pennsylvania and at which time he had already been detained for about one week.

43. Not until after Mr. Kong's interview with the Cambodian government and after Kong had been detained for approximately one month did ICE provide Kong with any information about how he could challenge the propriety of his ongoing detention.

44. At all times during Mr. Kong's arrest and detention, the ICE employees or agents who effected Kong's arrest and subsequent detention were and were acting as investigative or law enforcement officers of the United States.

45. On June 14, 2018, ICE released Mr. Kong from detention – after Kong had filed a petition for writ of habeas corpus with this Court that challenged the legality of his detention and the Court had noticed an evidentiary hearing to ascertain the circumstances surrounding the same.

46. As a result of ICE's above-described misconduct, Mr. Kong lost his job at Allen Medical and has been unable to find comparable employment such that he has lost compensation that he otherwise would have earned and expects to continue losing such compensation in the future.

47. As a result of ICE's above-described misconduct, Mr. Kong experienced emotional distress and anxiety.

48. On February 19, 2019, Mr. Kong – through counsel – presented the claim outlined herein to the appropriate federal agency via U.S. Postal Service and the agency acknowledged that it received the claim on February 22, 2019.

49. To date, the agency has failed to make final disposition of Mr. Kong's claim.

COUNT I – 28 U.S.C. § 2674
FALSE ARREST – MASSACHUSETTS COMMON LAW

50. Mr. Kong incorporates paragraphs 1 through 49 above as if fully restated below.

51. ICE employees or agents arrested Mr. Kong while acting within the scope of their respective office or employment.

52. The ICE employees or agents who effected Mr. Kong's arrest were investigative or law enforcement officers of the United States

53. ICE's arrest of Mr. Kong was unlawful.

54. Mr. Kong was harmed by this arrest.

55. A private individual in Massachusetts – including investigative or law enforcement officers – under such circumstances would be liable to Mr. Kong for the common law tort of false arrest.

COUNT II – 28 U.S.C. § 2674
FALSE IMPRISONMENT – MASSACHUSETTS COMMON LAW

56. Mr. Kong incorporates paragraphs 1 through 55 above as if fully restated below.

57. ICE employees or agents intentionally confined Mr. Kong while acting within the scope of their respective office or employment.

58. The ICE employees or agents who effected Mr. Kong's confinement were investigative or law enforcement officers of the United States

59. ICE's confinement of Mr. Kong was unlawful.

60. Mr. Kong was harmed by such confinement.

61. A private individual in Massachusetts – including investigative or law enforcement officers – under such circumstances would be liable to Mr. Kong for the common law tort of false imprisonment.

## COUNT III – 28 U.S.C. § 2674
## MASSACHUSETTS CIVIL RIGHTS ACT – MASS. GEN. LAWS CH. 12 §§ 11H-I

62. Mr. Kong incorporates paragraphs 1 through 61 above as if fully restated below.

63. ICE employees or agents interfered or attempted to interfere with Mr. Kong's exercise or enjoyment of rights secured by the Constitution or laws of the United States or by the Declaration of Rights or laws of the Commonwealth of Massachusetts – specifically, Kong's right to contest the propriety of his detention pursuant to Section 241.13 of Code of Federal Regulations Title 8, the Due Process Clause of the Fifth Amendment of the Constitution and the corresponding due process protections of the Declaration of Rights.

64. ICE employees or agents effected this interference or attempted interference by means of intimidation or coercion and did so while acting within the scope of their respective office or employment.

65. The ICE employees or agents who effected this interference or attempted interference were investigative or law enforcement officers of the United States.

66. Such interference or attempted interference by ICE injured Mr. Kong.

67. A private individual in Massachusetts – including investigative or law enforcement officers – under such circumstances would be liable to Mr. Kong under the Massachusetts Civil Rights Act.

*PRAYER FOR RELIEF*

Wherefore, Mr. Kong respectfully requests that the Court:

A. Award to Kong damages which compensate him for the injuries he suffered as a result of ICE's above-described misconduct or, if such damages cannot be calculated, then nominal damages as provided by applicable law;

B. Award to Kong the costs associated with his prosecution of this action;

C. Award to Kong post-judgment interest on any applicable amounts; and

D. Grant to Kong any further relief the Court deems to serve the interests of justice.

Respectfully submitted,
BUNTHOEUN KONG,

Dated: January 21, 2020

By his attorney,

/s/ Ethan R. Horowitz
_____

Ethan R. Horowitz
BBO # 674669
Northeast Justice Center
50 Island Street, Suite 203B
Lawrence, MA 01840
(978) 888-0624
ehorowitz@njc-ma.org