## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                              )

Bunthoeun Kong,                    )

                              )     CASE NO: 20-CV-10119-MPK

              Plaintiff,    )

                              )

vs.                             )

                              )

United States of America,    )

                              )

              Defendant.   )

_____ )

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
## AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### *INTRODUCTION*

In the early hours of the morning on April 17, 2018, officers from U.S. Immigration and Customs Enforcement ("ICE") arrested Plaintiff Bunthoeun Kong without warning as he left home and headed to work.  The arrest shocked Mr. Kong for, although Kong was aware that an Immigration Court had ordered his deportation to Cambodia in 1996, Kong also knew that Cambodia had refused to repatriate him and that in June of 2000 the legacy Immigration and Naturalization Service ("INS") had released him from prolonged immigration detention based on its determination that Kong could not be deported.  Moreover, during the last eighteen years, Mr. Kong had lived an exemplary life – by working a steady job to support his family, raising his children and always complying with the terms of his June 2000 release from INS custody.   So, in the weeks following this surprise arrest, as ICE shuttled Mr. Kong to various detention facilities and withheld any meaningful  explanation about what was happening to him, Kong

1

fretted over his job, his family and his safety – and wondered what had changed.  Yet, in fact, nothing had changed.  At the time ICE arrested Mr. Kong in April of 2018, it had no more specific information about Kong concerning the likelihood of his repatriation to Cambodia than what the INS possessed in June of 2000 when it had determined that Kong could not be deported. Indeed, ICE's admitted purpose in arresting and detaining Mr. Kong was to gather facts concerning whether or not Cambodia would repatriate him – by forcing Kong into a detained interview with representatives of the Cambodian government.  Simply put, ICE's reason for arresting and detaining Mr. Kong was to determine if it had an adequate basis for arresting and detaining him, that is, whether ICE could develop additional facts suggesting that Cambodia would repatriate Kong after two decades of refusing to do so.  Under such circumstances, ICE's arrest and detention of Mr. Kong was unlawful.

Blackletter law in this Circuit requires ICE officials to possess an individualized, fact-based suspicion that an alien is the proper subject of an arrest before immigration officers may deprive him of his freedom – a concept referenced in shorthand as probable cause.  Courts typically apply the probable cause requirement to immigration arrests in the context of whether or not the arresting officer had established an individualized, fact-based suspicion that the arrested alien has violated the Immigration and Nationality Act.  Yet, probable cause applies with equal force to the arrest of aliens like Mr. Kong who have violated the Act and are subject to a deportation order – now called a removal order.  This is so because neither a removal order nor a deportation order is a self-executing document and federal law requires that ICE officers obtain a warrant to arrest an alien before they execute such an order, a warrant which establishes the probable cause to support the arrest – specifically that the alien has both been ordered removed or deported for violating the Act *and* is likely to be repatriated to his country of origin.

While federal law presumes that an alien who has been ordered removed or deported may in fact be repatriated and thus allows the issuance of a removal or deportation warrant as a matter of course, the validity of such a warrant presumptively expires if ICE is unable to remove the alien within 90 days.  Moreover, ICE cannot issue such a warrant for an alien, like Mr. Kong, whom the Executive has explicitly determined cannot be repatriated, unless and until the agency develops probable cause to support the arrest – *i.e.*, an individualized and fact-based suspicion that circumstances have changed and the alien can be repatriated.  Moreover, to ensure that immigration officers adhere to this probable cause requirement, federal law further requires that ICE provide an alien who is arrested in such circumstances with some basic information about why ICE arrested him as well as a process by which the alien may challenge the basis of the arrest – a concept referenced in shorthand as due process.

Defendant cannot dispute that when ICE officers arrested Mr. Kong on April 17, 2018 they did so without any individualized and fact-based suspicion that Cambodia would repatriate him after approximately 20 years of having refused to do so.  Without more, those officers – as a matter of law – unlawfully arrested Mr. Kong and committed a tort that is actionable as a false arrest in the Commonwealth of Massachusetts and that is properly before this Court pursuant to its Federal Tort Claims Act (FTCA) jurisdiction.  Nor can Defendant dispute that when ICE officers subsequently caused Mr. Kong to remain detained for approximately eight weeks, until he procured his freedom through a petition for writ of habeas corpus, that they continued to lack any individualized and fact-based suspicion that Cambodia would repatriate Kong.  Without more, those officers – as a matter of law – unlawfully imprisoned Mr. Kong and committed a second tort that is actionable as false imprisonment in the Commonwealth and that is properly before this Court pursuant to its FTCA jurisdiction.  And lastly, when ICE officers arrested Mr.

Kong by surprise and refused to provide him with meaningful information about his arrest and detention, the totality of those circumstances coerced or intimidated Kong into relinquishing his right to challenge the lawful basis of his arrest and detention before participating in the detained interview – conduct which is actionable under the Massachusetts Civil Rights Act and properly before this Court pursuant to its FTCA jurisdiction.  Without more, Mr. Kong has properly stated a claim under the Civil Rights Act that should be permitted to proceed.

Accordingly, based on the foregoing as well as the argument below, Mr. Kong respectfully submits that he is entitled to judgment as a matter of law respecting Defendant's liability on Counts I and II of his Complaint – sounding in the Massachusetts common law of false arrest and false imprisonment – and that his Motion For Partial Summary Judgment on those claims should be granted.  Moreover, based on the foregoing as well as the argument below, Mr. Kong further submits that he has properly stated all claims contained in the Complaint and also requests that the Court deny Defendant's Motion to Dismiss.  Doc. 11.

*UNDISPUTED OR INDISPUTABLE FACTS*

On or about April 12, 1996, the Executive Office for Immigration Review ordered Plaintiff Bunthoeun Kong deported to Cambodia ("1996 Deportation Order").  *See* Pl.'s Concise Stmt. of Material Facts ("Pl.'s Stmt.") at ¶ 1.  Pursuant to the 1996 Deportation Order, the legacy Immigration and Naturalization Service ("INS") held Mr. Kong in immigration detention and attempted to effect his deportation to Cambodia.  *See id.* at ¶ 2.  On or about July 21, 1999, the INS determined that Mr. Kong's "removal from the United States [was] not possible or practicable."  *See id.* at ¶ 3.  On or about June 23, 2000, the INS released Mr. Kong from detention pursuant to an Order of Supervision.  *See id.* at ¶ 4.  On or about March 5, 2018, U.S. Immigration and Customs Enforcement ("ICE") added Mr. Kong to a list of Cambodian

nationals whom the agency wished to be interviewed by the Cambodian government, which – following the interview – would determine if Kong could receive a Cambodian travel document and be repatriated to Cambodia. *See id.* at ¶ 5. On or about April 17, 2018, ICE officers arrested and detained Mr. Kong to facilitate his detained interview with the Cambodian government. *See id.* at ¶ 6. Prior to his arrest, ICE advised Mr. Kong neither of its desire that he submit to an interview by the Cambodian government nor of its plans to facilitate that interview by arresting and detaining him. *See id.* at ¶ 7. At the time of his arrest, ICE did not know whether Cambodia would repatriate Mr. Kong following his interview and had no individualized facts concerning Kong in its possession which would alter the 1999 INS determination that Kong's repatriation to Cambodia was impossible or impracticable. *See id.* at ¶ 8. At the time ICE officers arrested Mr. Kong, ICE had just concluded a prior round of arrests and detained interviews with the Cambodian government – a process which spanned from December of 2017 through March of 2018 and at the conclusion of which twenty-three detainees were not accepted for repatriation. *See id.* at ¶ 9. ICE released Mr. Kong from detention on June 14, 2018 – following a Petition For Writ of Habeas Corpus filed by Kong – and Kong was aware that he was detained during this time. *See id.* at ¶ 10. During the entirety of Mr. Kong's ICE detention, ICE lacked any individualized and fact-based suspicion that Cambodia would repatriate Kong. *See id.* at ¶ 11. On or about February 19, 2019, Mr. Kong – through counsel – presented a claim to the U.S. Department of Homeland Security concerning the injuries he suffered as a result of his unlawful arrest and detention by ICE officers and ICE subsequently acknowledged receiving this claim on February 22, 2019. *See id.* at ¶ 12. By January 21, 2020, having received no further correspondence concerning his claim, Mr. Kong commenced the above-captioned action through counsel. *See id.* at ¶ 13.

*ARGUMENT*

I.    APPLICABLE LAW

A.    Rule 12 Motions

Whether challenging judicial jurisdiction to adjudicate a complaint pursuant to Civil Procedure Rule 12(b)(1) or challenging the sufficiency of the claims stated therein pursuant to Civil Procedure Rule 12(b)(6), a reviewing court must accept the complaint's "well-pleaded facts as true and draw[] all reasonable inferences in [plaintiff's] favor." *Martinez-Rivera v. Com. of P.R.*, 812 F.3d 69, 73 (1st Cir. 2016).  While a reviewing court may "consider whatever evidence has been submitted" when reviewing a defendant's jurisdictional arguments, it may only consider limited facts outside of the complaint when adjudicating a defendant's substantive attack – such as facts subject to judicial notice or documents specifically referenced in the complaint.  *Id.* at 74 (internal quotation omitted).

B.    Rule 56 Motions

When reviewing a motion for summary judgment, a court must determine for "each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought" whether "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this framework, the "movant must put the ball in play, averring an absence of evidence to support the nonmoving party's case." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990) (internal quotation omitted).  From there, the "burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'"  *Id.*  While the reviewing court must "take the record in the light most amiable to the nonmovants and indulge all reasonable inferences favorable to them

…[,] [o]n issues where the nonmovants bear the burden of proof, however, they must reliably demonstrate that specific facts sufficient to create an authentic dispute exist." *Id.*

    C.    Mr. Kong's Claims

The Federal Tort Claims Act ("FTCA") effects "a general waiver of federal sovereign immunity for tortious acts and omissions of federal employees," *Limone v. U.S.*, 579 F.3d 79, 88 (1st Cir. 2009), provided that the asserted tort claim is properly presented to the applicable agency and alleges wrongful conduct such that "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. §§ 2674, 2675(a). Moreover, within this general waiver is an explicit "waiver of sovereign immunity [as] to claims for six intentional torts," including false arrest and false imprisonment, "that are based on the 'acts or omissions of investigative or law enforcement officers.'" *Millbrook v. U.S.*, 569 U.S. 50, 53 (2013) (quoting 28 U.S.C. § 2680(h)); *see also* 28 U.S.C. § 2680(h) (defining investigative or law enforcement officers to include "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.").

    1.    Massachusetts Common Law of False Arrest and False Imprisonment

The core element of a claim for either false arrest or false imprisonment is the unlawful deprivation of the plaintiff's liberty by the defendant – that is an arrest or subsequent detention that lacks "reasonable grounds" or "probable cause." *Santiago v. Fenton*, 891 F.2d 373, 383 & n.3 (1st Cir. 1989) ("… it is a continuing tort … to unlawfully arrest and detain a person.") (internal quotation omitted). The First Circuit has unambiguously required immigration enforcement officers to have "probable cause" to support an "arrest and detention." *Morales v. Chadbourne*, 793 F.3d 208, 215 (1st Cir. 2015). While "probable cause has different meanings

in different contexts," *Com. v. Toland*, 11 Mass. L. Rptr. 685, *6 (Super. Ct. 2000) (Brassard, J.) (internal quotation omitted),[1] the *sine qua non* of reasonableness for the seizure of a person requires some "level of *individualized suspicion*," *Cochrane v. Quattrocchi*, 949 F.2d 11, 13 (1st Cir. 1991) (internal quotations omitted) (emphasis in original).  Under Massachusetts common law, unlike with a constitutional tort claim for Fourth Amendment violations, "the burden rests on a defendant to prove that its detention of a plaintiff was reasonable," *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 76 (Mass. 1987).

        2.        Massachusetts Civil Rights Act ("MCRA")

The core elements of a claim under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I, is that the "exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth … have been interfered with, or attempted to be interfered with, and … that the interference or attempted interference was by threats, intimidation, or coercion." *Davis v. Rennie*, 264 F.3d 86, 111 (1st Cir. 2001) (internal quotations omitted).  Specific intent to deprive a plaintiff of a protected right is not required for a determination of liability, provided that the sum of the conduct is "something akin to duress which causes the victim to relinquish her rights." *Broderick v. Roache*, 803 F. Supp. 480, 486 (D. Mass. 1992) (Mazzone, J.) (internal quotation and emphasis omitted); *see also Davis*, 264 F.3d at 112 ("…the Act imposes no express or implied requirement that the actor specifically intend to deprive a person of a secured right.") (internal quotation omitted).  Courts have thus broadly defined intimidation to encompass any activity that "involves putting [another]

---

[1] *See also*, *e.g.*, *Hernandez v. Montanez*, 36 F. Supp. 3d 202, 211 (D. Mass. 2014) (Saylor, J.) ("'The standard of reasonableness that governs searches [and seizures] in a given context depends, in general, upon a balancing of the need to search [or seize] against the invasion which the search [or seizure] entails.'") (quoting *Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir.1996)) (internal quotation omitted).

in fear for the purpose of compelling or deterring conduct" and with similar breadth have defined coercion to encompass "the application to another of such force, either physical or moral as to constrain him to do against his will something he would not otherwise have done." *Davis*, 264 F.3d at 111 (internal quotations omitted); *see also*, *e.g.*, *Broderick*, 803 F. Supp. at 487 (defining "intimidation as creation of fear to compel conduct; and coercion as the active domination of another's will") (internal quotations omitted). Although courts routinely interpret the MCRA in light of federal civil rights law, a proper defendant need not be a state actor. *See*, *e.g.*, *Lloyd v. Burt*, 997 F. Supp. 2d 71, 76 (D. Mass. 2014) (Neiman, M.J.) ("The remedy provided in §§ 11H and 11I is coextensive with the remedy provided under Federal law by means of 42 U.S.C. § 1983 (1982), except that the State statute does not condition the availability of the remedy on State action.") (internal quotation omitted); *accord. Cabi v. Boston Children's Hosp.*, 161 F. Supp. 3d 136, 148 (D. Mass. 2016) (Casper, J.).

## II. MR. KONG IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AGAINST THE UNITED STATES PURSUANT TO MASSACHUSETTS COMMON LAW

As outlined above, Mr. Kong has established Defendant's liability beyond a genuine dispute of material fact respecting his claims for false arrest and false imprisonment based on the undisputed conduct of ICE and its officers. Defendant does not, because it cannot, contest that ICE officers arrested Mr. Kong, subsequently caused his approximate eight-week confinement in immigration detention, confinement of which Kong was acutely aware, and declined Kong's properly presented administrative claim. *See* Pl.'s Stmt. at ¶¶ 6, 10, 11-13; *supra*, 28 U.S.C. §§ 2674, 2675(a); *Santiago*, 891 F.2d at 383 & n.3; *see also*, *e.g.*, *Noel v. Town of Plymouth*, 895 F. Supp. 346, 354 (D. Mass. 1995) (Saris, J.) ("The tort of false imprisonment consists in the (1) intentional and (2) unlawful (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement."). Defendant's only

substantive response to Mr. Kong's allegations is that Kong's arrest and detention were justified – specifically by the 1996 Warrant of Deportation issued by the legacy INS following its receipt of Kong's Deportation Order of the same year (1996 Warrant).  *See* Def. Mem. of Law, Doc. 12, at pp. 9-12 & Ex. D.  Yet this argument fails as a matter of law, insofar as the factual and legal validity of the 1996 Warrant had long since expired at the time ICE officers arrested Mr. Kong in April of 2018 and ICE otherwise lacked any probable cause which could make Kong's arrest lawful.

By basing its justification argument on the 1996 Warrant, Defendant acknowledges – as it must – that a deportation or "removal order, standing alone, is not self-executing" and the execution of such an order – that is, the arrest of the subject alien – must be accompanied by a warrant.  *Lopez-Aguilar v. Marion Cnty Sheriff's Dep't*, 296 F. Supp. 3d 959, 974 (S.D. Ind. 2017) (Barker, J.); *see also* 8 C.F.R. § 241.2 (requiring warrant to execute removal order);[2] 8 C.F.R. § 287.8(c)(2)(ii) ("A warrant of arrest shall be obtained *except* when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained.") (emphasis added).  Yet, what Defendant fails to acknowledge is that the 1996 Warrant, like any warrant authorizing an immigration arrest, must be supported by probable cause to be valid insofar as that is the standard required of *all immigration arrests*.  *See* 8 C.F.R. § 287.8(c)(2)(i) ("An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States."); 8 U.S.C. § 1357(a)(2) (same); *Morales*, 793 F.3d at 216 ("reason to believe must be considered the equivalent of probable cause.") (internal

---

[2] *See also* 8 C.F.R. § 243.2 (1996) (predecessor to 8 C.F.R. 241.2 requiring warrant to execute deportation orders); *Demore v. Kim*, 538 U.S. 510, 541 & n.2 (2003) (Souter, J.) (conc. & diss.) (explaining historical distinction between removal and deportation orders, one which is irrelevant to the current proceeding).

quotations omitted).  While the Immigration and Nationality Act (INA) allows ICE to presume that an alien who has been ordered removed will be repatriated and thus to issue a warrant for that alien's arrest shortly following receipt of his removal order, *see* 8 C.F.R. § 241.2(a)(1), this presumption does not last beyond the INA's statutorily prescribed 90-day removal period, *see* 8 U.S.C. §§ 1231(a)(1)-(3), and evaporates once the Executive releases the alien based on a determination that he cannot be repatriated.  *See U.S. Dep't of Justice Proposed Rules*, 62 Fed. Reg. 444-01, 451 (Jan. 3, 1997) ("The warrant of removal will authorize the [Immigration and Naturalization] Service to take an alien in the United States into custody during the removal period.") (proposing original version of 8 C.F.R. § 241.2); *U.S. v. Syphers*, 426 F.3d 461, 469 (1st Cir. 2005) ("lapse of probable cause will invalidate a warrant.") (internal quotation omitted).

Accordingly, although the use of the 1996 Warrant by the legacy INS to detain Mr. Kong and attempt to execute his deportation order was proper in 1996, insofar as the INS was permitted to assume that Cambodia would repatriate Kong, the document became a dead letter in 1999 when the INS subsequently determined that Kong's "removal from the United States [was] not possible or practicable" and released him from detention the following year.[3]  Pl.'s Stmt. at ¶¶ 2-3.  And so when ICE officers arrested and detained Mr. Kong in April of 2018, they did so with neither a valid warrant nor an individualized and fact-based suspicion that Cambodia would

---

[3] The 1996 Warrant was not only invalid in April of 2018, but was not even "fair on its face." Restatement (Second) of Torts §§ 122, 124 (1965); Restatement (First) of Torts §§ 122, 124 (1934).  To the extent that the Courts of the Commonwealth have adopted the Restatements in fleshing out the warrant privilege to the common law tort of false arrest, *see Morrill v. Hamel*, 148 N.E.2d 283, 285 (Mass. 1958), both Restatements make clear that one who effects an arrest pursuant to warrant must know the "general nature of the jurisdiction of the court, body, or official whose process he serves" – including the limited scope of its authority as well as any limits placed on such authority by statute or the Constitution.  *See* Restatement (Second) of Torts § 124 (1965) at cmts. c, e, h-i; Restatement (First) of Torts § 124 (1934) at cmts. c, e, h-i. Accordingly, the Executive – which had issued the 1996 Warrant – was charged with knowing the regulatory, statutory and Constitutional limitations of that document before ICE officers dusted it off after more than 20 years and relied upon it to arrest Mr. Kong.

repatriate Kong, but rather did so for the unlawful purpose of facilitating an interview and collecting facts which could justify the arrest.  *See id.* at ¶¶ 5-10; *see also*, *e.g.*, *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 29 (D.R.I. 2014) (McConnell, J.) ("… the Fourth Amendment does not permit seizures for mere investigations.") (citing *Ariz. v. U.S.*, 567 U.S. 387, 413 (2012)).  Without more, Defendant cannot carry its burden of justifying ICE officers' arrest or detention of Mr. Kong and thus Kong is entitled to judgment as a matter of law on his claims for false arrest as well as false imprisonment. *See*, *supra*, *Foley*, 508 N.E.2d at 76.

III.   MR. KONG'S COMPLAINT PROPERLY STATES A CLAIM AGAINST THE UNITED STATES PURSUANT TO THE MASSACHUSETTS CIVIL RIGHTS ACT

Defendant cannot dispute that when the legacy INS determined Mr. Kong's repatriation to Cambodia was "not possible or practicable" and subsequently released him from detention, Cmplt., Doc. 1, at ¶¶ 26-29, the Executive conferred upon him a constitutionally protected liberty interest in his freedom.  *See González-Fuentes v. Molina*, 607 F.3d 864, 886 (1st Cir. 2010) ("… an individual already enjoying certain forms of conditional release has a protected liberty interest in retaining them."); *DeWitt v. Ventetoulo*, 6 F.3d 32, 36 (1st Cir. 1993) ("… the state is not obliged by the Constitution to parole its prisoners, but having done so, it is obliged to afford them due process … when it revokes paroles.").  Nor can Defendant dispute that the Executive codified by regulation (Regulation 241.13) what it believed to be a constitutionally sufficient procedure which safeguarded this liberty interest and by which it was permitted to revoke the release of aliens like Mr. Kong – that is, aliens whom the Executive had released because it had determined that "there is no significant likelihood of removal to the country to which he or she was ordered removed … in the reasonably foreseeable future"  8 C.F.R. §§ 241.13(a), (i)(3) (requiring notice of "reasons for revocation" and prompt "opportunity to respond"); *see also Zadvydas v. Davis*, 533 U.S. 678, 724 (2001) (Kennedy, J.) (diss.) ("… removable aliens held

pending deportation have a due process liberty right to have the [Executive] conduct the review procedures in place."); *Detention of Aliens Ordered Removed*, 65 Fed. Reg. 80281-01, 80282-84 (Final Rule Dec. 21, 2000) (discussing promulgation of Regulation 241.13 in light of *Zadvydas* litigation and related constitutional challenges to detention of aliens with removal or deportation orders).  Moreover, Defendant does not – because it cannot – challenge Mr. Kong's allegations that ICE agents' shock-and-awe tactics of arresting Kong by surprise, transporting him to various detention facilities and withholding any information about the reason for his detention until days before his detained interview with the Cambodian government intimidated or coerced Kong into submitting to that interview without seeking any of the process to which he was due under Regulation 241.13.  *See* Cmplt., Doc. 1, at ¶¶ 36, 38-40, 42-43; *see also*, *e.g.*, *Lloyd*, 997 F. Supp. 2d at 76 ("… the MCRA contemplates a two-part sequence: liability may be found where (1) the defendant threatens, intimidates, or coerces the plaintiff in order to (2) cause the plaintiff to give up something that he has the constitutional right to do.") (internal quotation omitted); *Broderick*, 803 F. Supp. at 487 ("A scheme … even one carried out by non-physical threats or intimidation, would, if it induced [plaintiff] to give up secured rights, violate MCRA.").  Without more, Mr. Kong has properly stated a claim against Defendant under the Civil Rights Act.  *See*, *supra*, *Davis*, 264 F.3d at 111-12.

Instead of attacking the sufficiency of Mr. Kong's Civil Rights Act allegations, Defendant attempts to undermine the claim first by denying Kong had the right to notice and opportunity to respond and then by asserting that the Court lacks jurisdiction to hear the claim – neither of which contention has merit.  With respect to the first argument, whether one characterizes ICE's conduct toward Mr. Kong as "an effort to effect an order of removal," Def. Mem. of Law, Doc. 12, at p. 8, an arrest and detention or a revocation of release, ICE was

13

obligated to have an individualized factual basis supporting Kong's arrest – one which Regulation 241.13 aptly describes as a determination "that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future."  8 C.F.R. §  241.13(i)(2); *see also*, *supra*, 8 C.F.R. § 287.8(c)(2); 8 U.S.C. § 1357(a)(2) (same); *Morales*, 793 F.3d at 216. Accordingly, if ICE was required to adduce these facts prior to arresting and detaining Mr. Kong, Kong had a well-established right to receive notice of such facts and an opportunity to contest them, *see*, *supra*, *Zadvydas*, 533 U.S. at 724, a process which Regulation 241.13 explicitly outlines as notification "of the reasons for revocation" and a prompt "opportunity to respond to the reasons for revocation."  8 C.F.R. §  241.13(i)(3); *see also*, *e.g.*, *Rombot v. Souza*, 296 F. Supp. 3d 383, 388 (D. Mass. 2017) (Saris, J.). (describing Regulation 241.13 as "promulgated to protect a fundamental right derived from the Constitution or a federal statute") (internal quotation omitted); *Jimenez v. Cronen*, 317 F. Supp. 3d 626, 637-42 (D. Mass. 2018) (Wolf, J.) (even in the context of aliens ordered removed, ICE "must provide individualized procedures through which an alien might contest the basis of his detention.") (internal quotation omitted). Simply calling ICE's conduct something else neither altered Mr. Kong's rights nor excused ICE tactics aimed at intimidating or coercing Kong into forgoing those rights until after his scheduled interview with the Cambodian government.

With respect to the second argument, Defendant conveniently glosses over the fact that Federal Tort Claims Act (FTCA) jurisdiction broadly waives sovereign immunity for *any* "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment" as long as "a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. §  1346(b)(2); *see also Limon*, 579 F.3d at 88 ("The FTCA represents a general waiver of

sovereign immunity for tortious acts and omissions of federal employees.").  Defendant cannot contest that a Civil Rights Act violation is an intentional tort – sounding in coercion or intimidation, *see*, *supra*, *Davis*, 264 F.3d at 111-12, that applies to any private person in the Commonwealth.  *See*, *supra*, *Lloyd*, 997 F. Supp. 2d at 76; *Cabi*, 161 F. Supp. 3d at 148.  Nor can Defendants hide the fact that Civil Rights Act violations have been brought against the United States through the FTCA for decades.  *See*, *e.g.*, *Adedeji v. U.S.*, 782 F. Supp. 688, 702-03 (D. Mass. 1992) (Garrity, J.) (entering Civil Rights Act judgment against United States).  Indeed, amid the litany of authorities cited by Defendant to support its position that the "United States has not waived its sovereign immunity for claims brought pursuant to the Massachusetts Civil Rights Act," – Def. Mem. of Law, Doc. 12, at pp. 13-14 (quoting *Anderson v. Heffernan*, 2013 WL 1629122, *3 (D. Mass. Apr. 9, 2013)) – Defendant only offers one case in which a federal court declined FTCA jurisdiction over a Civil Rights Act claim, *on the ground that the plaintiffs failed to exhaust administrative remedies.  See Anderson*, 2013 WL 1629122 at *5-6.  Such is not the case here.  *See* Cmplt., Doc. 1, at ¶¶ 48-49.  Accordingly, Mr. Kong's Civil Rights Act claim withstands Defendants' claim-specific Rule 12(b)(1) and Rule 12(b)(6) challenges.

IV.   **SECTION 242(g) OF THE IMMIGRATION AND NATIONALITY ACT DOES NOT STRIP THE COURT OF ITS JURISDICTION TO ADJUDICATE MR. KONG'S CLAIMS**

Because Section 242(g) bars a litigant's access to judicial review, the Supreme Court has consistently construed the statute's  application to prevent judicial review of three narrow "discretionary determinations" of the Executive – specifically the "discrete acts of 'commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders.'"  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-87 (1999) ("AADC") (quoting 8

U.S.C. § 1252(g)).  The Supreme Court's 2018 opinion in *Jennings v. Rodriguez* affirmed this narrow reading of the statute and made clear that the Section 242(g) bar applied to "to just those three specific actions themselves" and not "any claim that can technically be said to arise from" those actions.  138 S. Ct. 830, 840-41 (2018) (internal quotation omitted).  Indeed, the *Jennings* court went as far as to provide concrete examples of tort claims that should not be deemed to arise from removal proceedings and thus be subject to an Immigration and Nationality Act bar – such as the assault of a detainee by an ICE officer, redress for inhumane conditions of confinement experienced by an ICE detainee or a negligence claim related to injuries sustained by an ICE detainee during an automobile accident while en route to a detention facility.  *See id.* at 840.  Accordingly, while lower courts disagreed prior to *Jennings* as to whether Section 242(g) barred intentional torts concerning unlawful ICE detention, *see* Def. Mem. of Law, Doc. 12, at pp. 6-7, the *Jennings* decision affirmed that the courts which had allowed such claims to proceed had reached the correct answer.  *See*, *e.g.*, *El Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp. 2d 249, 264-68 (D. Conn. 2008) (Hall, J.) (Section 242(g) did not bar FTCA intentional tort claims related to illegal arrest and detention of alien by ICE); *Avalos-Palma v. U.S.*, 2014 WL 3524758, *6-8 (D.N.J. Jul. 16, 2014) (Wolfson, J.) (same); *Arce v. U.S.*, 899 F.3d 796, 799-801 (9th Cir. 2018) (per curiam) (same).  And since *Jennings*, the lower courts have properly limited their application of Section 242(g) to effect its narrow purpose – that is, to prevent litigation challenging "ICE's decision to not to stay [an alien's] deportation" and seeking to enjoin a scheduled removal.  *Jimenez v. Nielsen*, 334 F. Supp. 3d 370, 383 (D. Mass. 2018) (Wolf, J.); *Viana v. Pres. of the U.S.*, 2018 DNH 073, 2018 WL 1587474, *3 (D.N.H. 2018) (McCafferty, J.) ("… jurisdictional bar imposed by § 1252(g) extends to claims where the alien challenges the timeframe in which authorities seek to remove him, as well as the specific relief

of a stay of removal."); *Candra v. Cronen*, 361 F. Supp. 3d 148, 156 (D. Mass. 2019) (Saris, J.) (same); *López López v. Charles*, 2020 WL 419598, *3-4 (D. Mass. Jan. 26, 2020) (Casper, J.) (same).

In the present case, Mr. Kong is not seeking to stop his removal, to change the time-frame of his removal or even to challenge ICE's discretion in deciding if and when to execute a removal order.  For, despite Defendant's repeated characterizations to the contrary, ICE's arrest and detention of Kong, as discussed in detail above, were not the execution of Kong's 1996 deportation order, but rather were part of an ill-conceived fact-finding mission to determine if that order could be executed.  *See* Pl.'s Stmt. at ¶¶ 5-11; s*ee also*, *e.g.*, *Arce*, 899 F.3d at 800 (Section "1252(g) does not strip the federal courts of jurisdiction over claims challenging the multitude of 'other decisions or actions that may be part of the deportation process—such as the decisions to open an investigation, to surveil the suspected violator …'") (quoting *AADC*, 525 U.S. at 482).  Indeed, while Section 242(g) protects from judicial review ICE's discretion to have prioritized Mr. Kong for removal and to have taken appropriate steps in furtherance of that end, it does not allow ICE to remove aliens by any means necessary and shield from review the agency's patently unlawful conduct – that is, arresting and detaining Kong without probable cause or intimidating and coercing him into forgoing his right to challenge that detention.  *See*, *e.g.*, *Avalos-Palma*, 2014 WL 3524758 at 8 ("Section 1252(g) is only intended to bar courts from interfering with discretionary decisions of the [Executive] in the context of deportation proceedings."); *Arce*, 899 F.3d at 800 (Section 242(g) "does not remove from judicial review actions in violation of mandatory duties") (internal quotation omitted).[4]  In this way, Section

---

[4] *See also*, *e.g.*, *Limon v. U.S.*, 579 F.3d 79, 101 (1st Cir. 2009) (agency never maintains discretion to take actions which contravene federal statute, federal regulation or the U.S. Constitution).

242(g) does not apply to Mr. Kong's claims and Defendant's attempt to dismiss the same for lack of jurisdiction should be denied.

*CONCLUSION*

Based on the foregoing, Mr. Kong respectfully requests that the Court enter judgment as a matter of law against the Defendant on Counts I and II of his Complaint, deny Defendant's Motion to Dismiss, Doc. 11, and order a scheduling conference so that the parties may plan discovery as to the remaining issues in this case – Defendant's liability on Count III and damages on all Counts.

Respectfully submitted,
BUNTHOEUN KONG,

Dated: May 11, 2020

By his attorney,

/s/ Ethan R. Horowitz
_____

Ethan R. Horowitz
BBO # 674669
Northeast Justice Center
50 Island Street, Suite 203B
Lawrence, MA 01840
(978) 888-0624
ehorowitz@njc-ma.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 11, 2020, the foregoing Memorandum – as well as its corresponding Concise Statement of Material Facts and the exhibits specifically referenced therein – were electronically filed with the Clerk of the Court through the CM/ECF system, which will send notification of such filing to registered participants, including counsel for the Defendant.

/s/ Ethan Horowitz

_____

Dated: May 11, 2020

Ethan R. Horowitz

BBO # 674669