UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BUNTHOEUN KONG,
    Plaintiff,

v.                                                              CIVIL ACTION NO. 20-10119-MPK[1]

UNITED STATES OF AMERICA,
    Defendant.

MEMORANDUM AND ORDER
ON DEFENDANT UNITED STATES OF AMERICA'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT (#11.)

KELLEY, U.S.M.J.

I.   Introduction.

    In January 2020 Bunthoeun Kong filed a three-count complaint against the United States of America under the Federal Tort Claims Act, 28 U.S.C. § 2674, alleging claims of false arrest (count I), false imprisonment (count II), and violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12 §§ 11H-I (count III).[2] The United States filed a motion to dismiss pursuant to Fed. R.

---

[1] With the parties' consent (#9), on April 9, 2020, this case was reassigned to the undersigned for all purposes, including trial and the entry of judgment. (#10.)

[2] Mr. Kong claimed loss "of his liberty without due process of law, in violation of the Fifth Amendment to the U.S. Constitution" in a habeas petition filed in May 2018. *See Kong v. Nielsen*, No. 18-cv-10901-GAO, #1 ¶¶ 11, 12. "Even after the REAL ID Act . . . the district court holds jurisdiction to review habeas challenges to unlawful immigration detention." *Rombot v. Moniz*, 299 F. Supp.3d 215, 218 (D. Mass. 2017). The habeas petition was dismissed on August 22, 2019. *Kong*, No. 18-cv-10901-GAO, #61.

Civ. P. 12(b)(1) for lack of subject matter jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim (#11); the dispositive motion has been fully briefed. (##12, 15.)

## II. The Facts.

On April 17, 2018, plaintiff was arrested by officers from U.S. Immigration and Customs Enforcement (ICE). (#1 ¶ 1.) Mr. Kong, a national of Cambodia, emigrated to the United States as a child in 1982. *Id.* ¶¶ 14, 18. As a young man, he was involved in criminal activity and was incarcerated. *Id.* ¶ 22. Mr. Kong was ordered deported to Cambodia in 1996 and so, when he was released from incarceration, he was detained by the Immigration and Naturalization Service (INS) (now ICE) pending his deportation. *Id.* ¶¶ 24, 25.[3] Because his country of origin refused to repatriate him at that time, after due consideration, the INS released Mr. Kong in June 2000 under an order of supervision. *Id.* ¶¶ 26, 28, 29.[4]

Mr. Kong lived in the United States under the order of supervision from June 2000 through April 2018. *Id.* ¶¶ 3, 14, 29. During this period, he married a United States citizen and had three children. *Id.* ¶¶ 5, 31, 33. He secured employment with a medical supply manufacturer where he worked for thirteen years. *Id.* ¶¶ 6, 32. Mr. Kong faithfully complied with the terms of his supervision order for nearly eighteen years. *Id.* ¶¶ 6, 34.

In December 2017, John A Schultz, Jr., the Deputy Assistant Director for the Removal Management Division, Enforcement and Removal Operations, ICE, Department of Homeland Security (DHS), declared as follows:

---

[3] A Warrant of Deportation for Mr. Kong was signed on April 12, 1996. (#12-4.)

[4] Mr. Kong's order of supervision required that he assist INS "in obtaining any necessary travel documents." (#12-2 ¶ 6.)

> 7. Pursuant to the repatriation agreement between the United States and Cambodia, Cambodian government officials periodically come to the United States and conduct in-person interviews to verify nationality of Cambodians with final removal orders. *See* Memorandum between the Government of the United States and the Royal Government of Cambodia for the Establishment and Operation of a United States-Cambodia Joint Commission on Repatriation Signed March 22, 2002, with an August 2003 addendum.
>
> 8. Not all Cambodian nationals with final orders of removal are presented to Cambodian government officials for interviews. Instead, ICE generally selects between 50 and 100 Cambodian nationals with final orders of removal who have strong evidence of Cambodian nationality and are within the scope of the agreement between the two countries.
>
> 9. Due to ICE's and Cambodia's experience implementing the agreement, ICE is able to identify aliens who would meet the Cambodian standards for travel document issuance.

(#14-4.)

Mr. Schultz subsequently filed another declaration in which he stated, inter alia:

> 3. In the fall of 2017, Cambodian government officials conducted verification interviews for 95 individuals. In December 2017, the Government of Cambodia issued travel documents for 72 of the 95 aliens interviewed . . . In March 2018, the Government of Cambodia issued travel documents for 18 additional aliens, 17 of the 18 travel documents being for individuals who had not previously received travel documents due to questions concerning various medical conditions. Among the 17, on March 29, 2018, Cambodia issued a travel document [for one individual]. Cambodia has also agreed to issue a travel document for an additional alien once a paperwork discrepancy is resolved. ICE is still seeking a travel document for another alien that Cambodia still has questions concerning his medical condition [sic]. ICE and the Government of Cambodia agree that the remaining 3 aliens are not Cambodian nationals. Thus, of the 95 aliens interviewed in the fall of 2017, ICE and the Government of Cambodia have, to date, reached agreement on 94 of them. Of the 94 aliens, 90 were issued travel documents, one is expected to be issued a travel document, and the three previously discussed were not Cambodian nationals.

(#14-5.)

At the end of February 2018, ICE contacted plaintiff and requested that he appear at the Burlington office to complete a questionnaire that was used to obtain travel documents from the

3

Cambodian government. (#12-2 ¶ 7.)[5] In March 2018 ICE submitted a travel document request to the Cambodian government, renewing the process of seeking a travel document for Mr. Kong to repatriate him. (#12-1 ¶ 7; #12-2 ¶¶ 8, 9.)[6] According to the Acting Assistant Field Office Director for DHS, ICE, Enforcement and Removal Operations in Burlington, Massachusetts: "ICE's HQ-Removal and International Operations unit advised the local ICE office that Mr. Kong had been added to a list of Cambodian individuals with final orders of removal to be interviewed by the Cambodian government to determine whether Cambodia would issue travel documents to effect repatriation to Cambodia." (#12-2 ¶ 9.)

On April 17, 2018, without notice, ICE officers arrested Mr. Kong "for the purpose of facilitating [his] interview with the government of Cambodia so that Cambodia could re-determine if it would repatriate [him]." (#1 ¶ 36; #12-2 ¶ 11.) Following his arrest, Mr. Kong was detained at various facilities in Massachusetts and Pennsylvania. (#1 ¶ 42.)[7] He was provided with no information regarding the reason for his arrest, i.e., that he was to be interviewed by the Cambodian government for repatriation, until about a week into his detention. *Id*. Mr. Kong was interviewed by the Cambodian government on May 3, 2018. (#12-2 ¶ 11.) Only after his interview and a month in detention was Mr. Kong advised how he could challenge his ongoing detention. (#1 ¶¶ 9, 43.) After filing a petition for a writ of habeas corpus, he was released from ICE detention on June 14,

---

[5] In an affidavit, Mr. Kong stated that he did not understand the reason for the February 2018 meeting given that he had just attended his regularly scheduled meeting with the authorities in December 2017. (#14-2 ¶¶ 24-26.) Nor did he understand the papers he was asked to sign, and they were never explained to him. *Id*. ¶ 26.

[6] Mr. Schultz stated in an affidavit: "Beginning in 2002 and every year since then, the United States has repatriated Cambodian nationals with final orders of removal in accordance with an agreement with the Cambodian government." (#14-4 ¶ 6.)

[7] "As a matter of practice, the Cambodian government requires in-person interviews in one location with individuals with final orders of removal prior to issuing travel documents." (#12-2 ¶ 10.)

2018, pursuant to an order of supervision. *Id*. ¶¶ 10, 45; #12-2 ¶ 13. That same day, June 14, 2018, the Cambodian government issued a travel document for Mr. Kong. (#12-2 ¶ 11; #14-7 ¶ 5.)[8]

In this suit, Mr. Kong claims that his 2018 arrest and confinement by ICE were unlawful, and that his civil rights were violated. He seeks monetary damages to compensate him for the injuries he suffered arising from this alleged misconduct.

### III.  Legal Standard.

Pursuant to Rule 12(b)(1), Fed. R. Civ. P., a defendant may move to dismiss an action based on lack of federal subject matter jurisdiction. "'Because federal courts are courts of limited jurisdiction, federal jurisdiction is never presumed.' The party asserting jurisdiction has the burden of demonstrating the existence of federal jurisdiction." *Fabrica de Muebles J.J. Alvarez, Incorporado v. Inversiones Mendoza, Inc.*, 682 F.3d 26, 32 (1st Cir. 2012) (quoting *Viqueira v. First Bank*, 140 F.3d 12, 16 (1st Cir.1998)). Once a defendant challenges the jurisdictional basis for a claim under Rule 12(b)(1), the plaintiff bears the burden of proving jurisdiction. *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *see also Justiniano v. Soc. Sec. Admin.*, 876 F.3d 14, 21 (1st Cir. 2017).

In ruling on a motion to dismiss for lack of jurisdiction, the court must "'credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor.'" *Sanchez ex rel. D.R.-S. v. United States*, 671 F.3d 86, 92 (1st Cir. 2012) (quoting *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010)). The "court may also 'consider whatever evidence has been submitted, such as the depositions and exhibits submitted.'" *Merlonghi*, 620 F.3d at 54 (1st Cir. 2010) (quoting *Aversa v. United States*, 99 F.3d 1200, 1210 (1st Cir. 1996)); *Carroll v.*

---

[8] After being released, Mr. Kong was successful in having his final order of deportation vacated. (#14-7 at ¶¶ 6-7.)

*United States*, 661 F.3d 87, 94 (1st Cir. 2011) (internal citation and quotation marks omitted) ("In evaluating a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, we construe plaintiffs' complaint liberally and ordinarily may consider whatever evidence has been submitted, such as . . . depositions and exhibits."). That being said, a plaintiff cannot assert a proper jurisdictional basis "merely on 'unsupported conclusions or interpretations of law.'" *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (quoting *Washington Legal Foundation v. Massachusetts Bar Foundation*, 993 F.2d 962, 971 (1st Cir. 1993)), *cert. denied*, 515 U.S. 1144 (1995); *Johansen v. United States*, 506 F.3d 65, 68 (1st Cir. 2007).

IV. <u>Analysis</u>.

Judicial review in immigration cases is circumscribed by the provisions of the Illegal Immigration Reform and Responsibility Act and Real ID Act. *Lopez Lopez v. Charles*, No. 12-CV-101445-DJC, 2020 WL 419598, at *3 (D. Mass. Jan. 26, 2020) (citing 8 U.S.C. § 1252; *Aguilar v. U.S. Immigration & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 9 (1st Cir. 2007) (explaining that section 1252 is a "general jurisdictional limitation" and applies to "all questions of law and fact and extends to both constitutional and statutory challenges" arising from removal)). Of specific interest here, 8 U.S.C. § 1252(g) provides:

> [e]xcept as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

The Supreme Court has read this statutory provision narrowly: "[T]he provision applies only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'. . . It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims

6

arising from deportation proceedings." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (emphasis in original); *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) ("We did not interpret this language ['any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter'] to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General. Instead, we read the language to refer to just those three specific actions themselves."). Despite the Supreme Court's narrow interpretation, section 1252(g) "is not ambiguous. Unlike other provisions in § 1252, it does not limit itself to 'discretionary' decisions . . . or preserve jurisdiction over 'constitutional claims or questions of law.'" *Jimenez v. Nielsen*, 334 F. Supp.3d 370, 383 (D. Mass. 2018) (citations omitted); *see also Lopez Lopez*, 2020 WL 419598, at *4 (citation omitted) ("The bar under Section 1252(g) applies to 'any cause or claim' arising from the execution of a removal order, including constitutional claims."); *Candra v. Cronen*, 361 F. Supp.3d 148, 156 (D. Mass. 2019) (citations omitted) ("Section 1252(g) bars 'any cause or claim' that arises from executing a removal order. . . . It applies to constitutional as well as statutory claims.").

The United States argues that the claims advanced by Mr. Kong in his complaint arise from ICE's decision to execute the outstanding removal order against him[9] and thus the court is without jurisdiction to consider them under 8 U.S.C. § 1252(g). The facts show that in 2000, Mr. Kong was released from custody subject to an order of supervision because his country of origin, Cambodia, would not repatriate him. Cambodia's willingness to repatriate its nationals changed in

---

[9] In his habeas petition, Mr. Kong alleged that "[t]he purpose of Mr. Kong's arrest [on April 17, 2018,] was to remove Kong to his native Cambodia," and "ICE officers arrested Mr. Kong . . . apparently for the purpose of revoking his Order of Supervision and effecting his removal to Cambodia." *See Kong v. Nielsen*, No. 18-cv-10901-GAO, #1 ¶¶ 2, 42.

2002, when it entered into an agreement with the United States for that very purpose. Over the years of working with Cambodian government officials to effectuate the agreement, ICE developed a working knowledge regarding which aliens subject to a final order of deportation would meet the Cambodian standards for the issuance of travel documents. Mr. Kong has acknowledged "that ICE's renewed efforts in 2017-2018 to repatriate Cambodian nationals were largely successful." (#20 at 5 n.3.)[10]

Asking Mr. Kong to appear at ICE offices in February 2018 so he could complete the questionnaire relied on by the Cambodian government in deciding whether to issue travel documents was undoubtedly a step in the process of executing his removal order. So, too, was ICE's submission of that document to the Cambodian government the following month, for that reinitiated the process of requesting a travel document for Mr. Kong. Based on its expertise in working with Cambodia to implement the repatriation agreement, ICE determined that Mr. Kong was a candidate for an interview with Cambodian government officials, who would then decide if Cambodia would issue travel documents for him. Removal was reasonably foreseeable given the recent successful repatriation effort, and, given its experience implementing the repatriation agreement, ICE was aware that Mr. Kong was a national for whom the Cambodian government was likely to issue travel documents. In April 2018 Mr. Kong was arrested to facilitate his interview with Cambodian government officials. While he had been free on an order of supervision

---

[10] The parties disagree regarding the success rate of repatriation between October 2017 and April 2018, with plaintiff claiming a repatriation rate of 80% while defendant calculates it at nearly 95%. *Compare* #20 at 5 n. 3, *with* #19 ¶ 8. Coupled with ICE's experiential knowledge of what Cambodia required for repatriation, both 95% and 80% repatriation rates support a determination "that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future" for revocation of release. 8 C.F.R § 241.13(i)(2).

until that time, Mr. Kong nonetheless was subject to a final order of deportation pursuant to which a warrant of deportation had issued.

Mr. Kong's FTCA claims for wrongful arrest, wrongful detention, and violation of his due process rights under the MCRA are all directly related to, and arise from, actions taken by ICE to execute his final deportation order. Under § 1252(g), the court does not have jurisdiction over claims that arise from a decision by the Executive Branch to execute a final order of removal. *See Rranxburgaj v. Wolf*, 825 F. App'x 278, 282 (6th Cir. 2020); *Hamama v. Adducci*, 912 F.3d 869, 874 (6th Cir. 2018) ("Under a plain reading of the text of the statute [§ 1252(g)], the Attorney General's enforcement of long-standing removal orders falls squarely under the Attorney General's decision to execute removal orders and is not subject to judicial review."); *Silva v. United States*, 866 F.3d 938, 940 (8th Cir. 2017) (citing *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 943 (5th Cir. 1999) ("[C]laims that clearly are included within the definition of 'arising from' ... [are] those claims connected directly and immediately with a 'decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders'.")); *see also Foster v. Townsley*, 243 F.3d 210, 214-15 (5th Cir. 2001) ("The particular acts that form the basis of [plaintiff's] lawsuit arise from the officials' decision to execute his removal order. His claims of excessive force, denial of due process, denial of equal protection and retaliation are all directly connected to the execution of the deportation order. Therefore, their acts fall within the ambit of section 1252(g) and are precluded from judicial review."); *Gupta v. McGahey*, 709 F.3d 1062, 1065-66 (11th Cir. 2013) (per curiam).

Mr. Kong contends that the *Jennings* decision supports the conclusion that § 1252(g) does not preclude FTCA claims for intentional torts relating to unlawful detention by ICE. However, whether a particular claim is barred by § 1252(g) must be determined by a fact-intensive inquiry,

not generalizations. *See*, e.g., *Cardona v. United States*, No. 16-CV-0546-AJB-BGS, 2017 WL 3337144, at *5–6 (S.D. Cal. Aug. 4, 2017) (distinguishing between an FTCA claim for false arrest, an "action [that] falls squarely within the confines of § 1252(g) because it is directly connected with the decision to execute the reinstatement of removal[,]" and claims for negligence and intentional infliction of emotional address for failure to do a fingerprint comparison and deporting plaintiff in violation of the relevant statute, "facts [that] take the bulk of [plaintiff's] claims outside the scope of § 1252(g)").

The cases upon which Mr. Kong relies make this clear. For example, in *El Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp.2d 249 (D. Conn. 2008), plaintiff was arrested and detained for "suspected immigration violations," despite the fact that he had "lawful immigration status." *Id.* at 252. Frustrated at being held in a state corrections center without proper medical care and being unable to practice his religion, El Badrawi agreed to depart immediately from the United States. *Id.* However, officials delayed his release and did not remove him for an additional forty days. *Id*.

The court concluded that plaintiff's FTCA claims for malicious prosecution and abuse of process were barred by § 1252(g) because "by their very nature, [the claims sought] to impose liability for the government's decision to initiate legal proceedings against" plaintiff. *Id.* at 265. However, claims arising from plaintiff's arrest and initial detention[11] made pending his appearance in immigration court were not barred "because DHS's decisions to arrest and detain [plaintiff] were decisions that were separate and discrete from the agency's decision to initiate removal proceedings against him." *Id.* at 266. The court noted that "El Badrawi's detention probably would

---

[11] "Connecticut treats the torts of false arrest and false imprisonment identically." *El Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp.2d 249, 264 (D. Conn. 2008) (citations omitted).

not have been constitutionally problematic if the government had detained him for only a period of time reasonably necessary to effectuate his voluntary departure order. But once that reasonable period passed (and such period surely was less than 42 days, at least based on the pleadings), El Badrawi's detention became arbitrary, notwithstanding that there was still a reasonable possibility he would be released in the near future." *Id.* at 270 n.20.

The plaintiff in *Avalos-Palma v. United States*, No. 13-cv-5481 (FLW), 2014 WL 3524758 (D.N.J. July 16, 2014), was improperly deported in violation of a mandatory stay. *Id.* at *1. The court determined that plaintiff's FTCA claims arose not from the decision to execute his removal, but "from ICE's failure to abide by the stay[.]" *Id.* at *8. "[O]nce [p]laintiff filed the motion to reopen deportation proceedings, ICE agents were required to stay [p]laintiff's deportation. Because the ICE agents violated the mandatory stay, the Government does not enjoy the immunity of Section 1252(g)." *Id*.

Similarly, in *Arce v. United States*, 899 F.3d 796, 798-99 (9th Cir. 2018), plaintiff was deported to Mexico in violation of a court-ordered stay. The Ninth Circuit rejected the government's contention that § 1252(g) precluded plaintiff's FTCA claims for false arrest and imprisonment, intentional infliction of emotional distress, and negligence because "his claims arise not from the execution of the removal order, but from the violation of our court's order. . . . Put differently, but for the violation of the stay of removal, [plaintiff] would not have an FTCA claim at all." *Id.* at 800. The court held that "[a] decision or action to violate a court order staying removal . . . falls outside of the statute's [§ 1252(g)] jurisdiction-stripping reach." *Id*.[12]

---

[12] The Ninth Circuit recognized that the Eighth Circuit had decided the issue differently:

> We acknowledge that the Eighth Circuit, in a split decision, reached a contrary result, holding that it lacked jurisdiction over the FTCA claims of a noncitizen who was wrongfully removed in violation of stay issued by the BIA. *Silva v. United*

In contrast to those in *El Badrawi*, *Avalos-Palma*, and *Arce*, the plaintiff in *Viana v. President of United States*, No. 18-cv-222-LM, 2018 WL 1587474 (D.N.H. Apr. 2, 2018), filed suit seeking injunctive relief to forestall his removal from the United States. Viana was subject to a final order of deportation and was seeking time to "pursu[e] various avenues for relief from removal." *Id.* at *1. Finding § 1252(g) "dispositive," the district court concluded that plaintiff's complaint "challenge[d] the manner in which immigration authorities decided to execute his removal order[.] His claims are dependent on and grounded in that decision, and thus are reasonably understood to 'arise from' that decision." *Id*. at *2 (citation omitted).[13]

Here, as in *Viana*, plaintiff's FTCA claims arise from the decision to execute his final order of deportation. Mr. Kong completed the mandated questionnaire, and the request for the issuance of travel documents was made prior to April 2018. After being placed on a list of individuals with outstanding final orders of revocation, he was arrested and detained to facilitate the in-person interview with Cambodian officials, which was part of the repatriation process under the agreement. Approximately a month and a half after his interview, the Cambodian government, in fact, issued travel documents for him.

---

*States*, 866 F.3d 938, 939 (8th Cir. 2017). The *Silva* majority held that § 1252(g) eliminated jurisdiction because the removal order 'still existed' in spite of the stay, thereby 'connect[ing]' the FTCA claim 'directly and immediately' to the decision to execute the order.

*Id.* at 940 (quoting *Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 943 (5th Cir. 1999))." *Arce v. United States*, 899 F.3d at 796, 801 (9th Cir. 2018).

[13] The district court also specifically "disagree[d] that § 1252(g) does not extend to due process claims generally. The provision itself contains no such limitation: it covers 'any cause or claim' within its ambit, 8 U.S.C. § 1252(g), which includes constitutional claims[.]" *Viana v. President of United States*, No. 18-CV-222-LM, 2018 WL 1587474, at *3 (D.N.H. Apr. 2, 2018) (citations omitted).

According to Mr. Kong, his arrest and detention in April 2018 "were not the execution of [his] 1996 deportation order, but rather were part of an ill-conceived fact-finding mission to determine if that order could be executed." (#15 at 17.)[14] Plaintiff further argues that the validity of a deportation warrant "presumptively expires if ICE is unable to remove the alien within 90 days." *Id.* at 3. Consequently, the government's contention that the arrest and detention were justified by the 1996 Warrant of Deportation must fail, because "the factual and legal validity of the 1996 Warrant had long since expired at the time ICE officers arrested Mr. Kong in April of 2018[.]" *Id.* at 10. After it has been determined that an alien cannot be repatriated, as was the case with Mr. Kong in 2000, plaintiff claims that, in order to issue a warrant, ICE must "develop[] probable cause to support the arrest – i.e., an individualized and fact-based suspicion that circumstances have changed and the alien can be repatriated." *Id.* at 3. Because ICE arrested Mr. Kong without the "individualized and fact-based suspicion" he claims is required, plaintiff was unlawfully arrested and detained, acts not shielded by § 1252(g).

The lynchpin of plaintiff's argument is that the warrant of deportation somehow expired, but the authority he cites does not support that legal proposition. Mr. Kong relies on 8 U.S.C. §§ 1231(a)(1)-(3), but these statutory provisions say nothing about a presumptive expiration of a warrant. Plaintiff also quotes language from the 1997 U.S. Department of Justice Proposed Rules, i.e., "[t]he warrant of removal will authorize the [Immigration and Naturalization] Service to take an alien in the United States into custody during the removal period," but simultaneously notes that language was proposed for the original version of 8 C.F.R. § 241.2. *Id.* at 11. The "proposed"

---

[14] This argument is off the mark. The interview with government officials was a step in the process of effectuating the removal, because only the Cambodian government could determine if it would repatriate Mr. Kong.

13

language is not binding and, in any event, says nothing about the warrant becoming invalid with the passage of time.

Finally, the single case cited discussing probable cause involved a search warrant for child pornography, unrelated to immigration law. *See United States v. Syphers*, 426 F.3d 461, 463-65 (1st Cir. 2005). Here, the warrant for deportation was issued upon the entry of a final order of deportation. Given that the final order of deportation remained outstanding at the time Mr. Kong was arrested, so, too, did the legal basis for the warrant of deportation.

There is case law that undercuts plaintiff's argument that the warrant of deportation was no longer valid. In *Spector v. Landon*, 209 F.2d 481 (9th Cir. 1954), appellant was admitted to the United States in August of 1913, and was still living in this country when, after deportation proceedings for commission of a federal offense, a warrant issued for his deportation to Russia in August 1930. *Id*. at 482. The United States made several attempts to deport him over a period of years, up to and including August of 1948, but Russia refused to permit the deportation. *Id*. Appellant brought suit to have the outstanding warrant of deportation declared without force or "functus officio by virtue of unexcused lapse of time." *Id*. The Ninth Circuit observed that "[n]o cases have been found . . . holding that a deportation warrant becomes invalid or unenforceable through mere lapse of time, or for that matter because of dilatory conduct or laches on the part of the immigration authorities in effecting a deportation[,]" before ultimately rejecting the contention that the deportation warrant became "ineffective or void because of the delay in execution." *Id*. at 482-83;[15] *see also Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1113 (9th Cir. 2001). While admittedly the case is old, the court has found no law contradicting the analysis.

---

[15] The Court also observed that "the delay in effecting appellant's deportation operated to his advantage rather than the reverse. He has been permitted to remain in the United States, has been

Mr. Kong also argues that his arrest and detention contravened the Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678 (2001). The issue in *Zadvydas* was "whether aliens that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States." *Id.* at 695. The Court "conclude[d] that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id*. at 699.

On the facts of this case, Mr. Kong's arrest and detention did not offend *Zadvydas*, 8 U.S.C. § 1231, or the applicable regulation, 8 C.F.R § 241.13(i)(2), which provides:

> The Service may revoke an alien's release under this section and return the alien to custody if, on account of changed circumstances, the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future. Thereafter, if the alien is not released from custody following the informal interview provided for in paragraph (h)(3) of this section, the provisions of § 241.4 shall govern the alien's continued detention pending removal.

8 C.F.R. § 241.13(i)(2). A warrant of deportation and a final order of deportation were outstanding at the time Mr. Kong was arrested. Circumstances had changed since plaintiff was released pursuant to an order of supervision, because the United States had subsequently entered into a repatriation agreement with Cambodia. Implementation of that agreement had been successful, particularly in the year prior to Mr. Kong's arrest. Based on a questionnaire completed by Mr. Kong, a request was made to Cambodia to issue travel documents for him, thereby starting anew the repatriation process. It was determined that Mr. Kong was a candidate for an in-person interview with Cambodian officials as provided in the repatriation agreement to determine nationality before issuing travel documents. Based on all the facts at the time he was arrested, there

---

free to go where he would and to enjoy such material advantages as the country affords to its own citizens." *Spector v. Landon*, 209 F.2d 481, 482–83 (9th Cir. 1954).

was "a significant likelihood that [Mr. Kong] may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2).

### V. Conclusion and Order.

Mr. Kong's complaint challenges the decision to execute his deportation order. As such, the court has no jurisdiction to adjudicate his claims under 8 U.S.C. § 1252(g). Defendant United States of America's Motion to Dismiss Plaintiff's Complaint (#11) pursuant to Fed. R. Civ. P 12(b)(1) is GRANTED. Judgment shall enter in favor of defendant.


March 23, 2021

/s/ M. Page Kelley
M. Page Kelley
Chief United States Magistrate Judge