# United States Court of Appeals
## For the First Circuit

No. 21-1319

BUNTHOEUN KONG,

Plaintiff, Appellant,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. M. Page Kelley, U.S. Magistrate Judge]

Before

Kayatta, Lipez, and Gelpí,
Circuit Judges.

Ethan R. Horowitz, with whom Northeast Justice Center was on
brief, for appellant.

Eve A. Piemonte, Assistant United States Attorney, with whom
Nathaniel R. Mendell, Acting United States Attorney, was on brief,
for appellee.

Adriana Lafaille and Rebecca R. Krumholz on brief for American
Civil Liberties Union of Massachusetts, amicus curiae.

March 15, 2023

LIPEZ, **Circuit Judge**.  Bunthoeun Kong claims that he was improperly arrested and detained by federal immigration officers for the purpose of repatriating him to Cambodia.  He now seeks damages from the United States under the Federal Tort Claims Act ("FTCA") for false arrest, false imprisonment, and violation of the Massachusetts Civil Rights Act ("MCRA").  Concluding that 8 U.S.C. § 1252(g) deprived it of jurisdiction, the district court dismissed Kong's complaint in its entirety.  We reverse and remand.  Section 1252(g)'s bar on judicial review of claims "arising from" the government's decision to "execute removal orders" does not preclude jurisdiction over the challenges to the legality of the detention at issue here.

**I.**

**A. The Deportation Proceedings[1]**

Kong, a native of Cambodia, emigrated to the United States as a refugee in 1982, when he was approximately nine years old.  Kong was convicted in California state court on January 23, 1995, for the felony of aggravated assault with a weapon, and he

---

[1] In 1996, Congress combined "deportation" and "exclusion" proceedings into a single "removal" proceeding.  Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, sec. 304(a), § 240, 110 Stat. 3009-546, 3009-589 to 3009-593 (codified at 8 U.S.C. § 1229a).  Because Kong's initial arrest involved a deportation proceeding, we use that phrase here and when referring to his deportation order or warrant.  Otherwise, we use the word removal.

was sentenced to two years' incarceration. In the course of his state incarceration, he was taken into custody by then-U.S. Immigration and Naturalization Service ("INS"), now U.S. Immigration and Customs Enforcement ("ICE"), and placed into deportation proceedings. Kong was ordered to be deported to Cambodia on April 12, 1996, and the government obtained a warrant for his deportation. However, the United States had no repatriation agreement in place with Cambodia at that time, and the Cambodian government refused to accept him. Thus, Kong remained detained in the United States.

In July 1999, while Kong was still in custody, the INS informed him that his "removal from the United States [was] not possible or practicable." The notice also advised him that he could be released from custody if he could demonstrate that he would not pose a flight risk or danger to the community. Kong successfully made that showing, and he was granted supervised release in June 2000 after completing an in-custody rehabilitation program that focused on "addiction, discipline and therapy." Among other conditions, Kong's order of supervision required him to "appear in person at the time and place specified, upon each and every request of the [INS], for identification and for deportation or removal," and to "assist the [INS] in obtaining any necessary travel documents." The parties agree that Kong abided by the terms of his supervised release. In the eighteen years following his

release in 2000, Kong avoided further criminal convictions, married a United States citizen, raised three children, and maintained steady employment.

## B. The Government's Efforts to Repatriate Kong

The United States and Cambodia negotiated a repatriation agreement in 2002. Pursuant to this agreement, Cambodian officials periodically travel to the United States to conduct in-person interviews to verify the Cambodian nationality of individuals subject to final removal orders. Fifteen years later, in 2017, ICE began a campaign of mass arrests of Cambodian nationals living under orders of supervision, with the goal of compelling them to participate in repatriation interviews.

In February 2018, Kong was contacted by ICE as part of this enforcement effort against Cambodian nationals. He was told to report to the agency's Burlington, Massachusetts office, where he completed a questionnaire that the United States intended to use to obtain a travel document from the Cambodian government for the purpose of repatriating him. It is undisputed that Kong was not informed of the purpose of this paperwork or that his supervised release might be terminated because of the changed relationship between the United States and Cambodia. In March 2018, ICE asked Cambodia for the travel document for Kong. A month later he was arrested without notice while on his way to work. Kong alleges that ICE gave him no explanation for his arrest until

- 4 -

he had been detained for approximately a week and that he was not told how to challenge his detention for about a month. His interview with the Cambodian government occurred in early May 2018.

After Kong filed a petition for a writ of habeas corpus in May 2018,[2] ICE released him on an order of supervision in June 2018. That same month, the Cambodian government issued his travel document, but Kong successfully moved to reopen his immigration proceedings approximately one week later.[3]

## C. Procedural History

In February 2019, Kong submitted a claim for damages to the Department of Homeland Security ("DHS") pursuant to the FTCA, 28 U.S.C. § 2674, seeking compensation for harms caused by his arrest and detention, including lost wages and benefits. DHS acknowledged receipt of his claim but did not otherwise respond to it.

Kong then brought this FTCA action alleging false arrest, false imprisonment, and interference with a protected right under the MCRA, Mass. Gen. Laws ch. 12, §§ 11H-I. Kong named

---

[2] The district court dismissed Kong's habeas petition on August 22, 2019. Order Dismissing Case, See Kong v. Nielsen, No. 18-cv-10901-GAO (D. Mass. Aug. 22, 2019), ECF No. 61.

[3] The record does not reveal the present status of these proceedings. But when an immigration judge reopens a case, the existing removal or deportation order is stayed, meaning that Kong cannot be removed while the case is undergoing review. See Nken v. Holder, 556 U.S. 418, 429 n.1 (2009).

- 5 -

as perpetrators of these alleged violations "ICE employees or agents" without specifying any individuals. He asserted that the government lacked probable cause to arrest and detain him because it failed to determine that his removal was significantly likely in the reasonably foreseeable future, as required by a federal regulation, 8 C.F.R. § 241.13(i)(2), directing the government to make such a determination when it seeks to revoke the release of a noncitizen who has been compliant with the terms of his release. Kong also alleged as part of his MCRA claim that the government failed to follow its own regulation, 8 C.F.R. § 241.13(i)(3), requiring ICE to give him notice of the reasons for his detention and to provide him an informal hearing to contest the propriety of his detention.

**D. The District Court Decision**

In March 2021, the district court, confronted with the difficult issues in this case, granted the government's motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). The court held that the government's decision to return Kong to detention is shielded from judicial review by statute, specifically 8 U.S.C. § 1252(g), which, inter alia, deprives federal courts of jurisdiction over claims arising from decisions or actions to execute removal orders. See Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 482 (1999).

The court reasoned that Kong's "FTCA claims for wrongful arrest, wrongful detention, and violation of his due process rights under the MCRA are all directly related to, and arise from, actions taken by ICE to execute his final deportation order" -- namely actions beginning with ICE's determination that Kong should be interviewed by Cambodian officials and including his arrest and re-detainment to facilitate that interview. Kong v. United States, No. 20-10119-MPK, 2021 WL 1109910, at *5 (D. Mass. Mar. 23, 2021).

Although the court dismissed Kong's action for lack of subject-matter jurisdiction, it also commented extensively on the merits of his claims.  The court noted that Kong's claims rest in large part on his contention that ICE could not justify his arrest based solely on the deportation warrant issued in 1996.  ICE needed instead, he argued, to develop probable cause to arrest him by making a new individualized finding under 8 C.F.R. § 241.13(i)(2) that his removal was significantly likely in the reasonably foreseeable future.  Rejecting this argument, the court stated that the initial warrant of deportation from 1996 remained valid. Id. at *7-*8.  In so concluding, the court relied on a 1954 decision by the Ninth Circuit observing that a deportation warrant does not become "ineffective or void because of [a] delay in execution." See Spector v. Landon, 209 F.2d 481, 482-84 (9th Cir. 1954) ("No cases have been found . . . holding that a deportation warrant becomes invalid or unenforceable through mere lapse of time, or

for that matter because of dilatory conduct or laches on the part of the immigration authorities in effecting a deportation."). Finding no cases to the contrary, the district court held that the 1996 deportation warrant provided the probable cause necessary to justify Kong's 2018 rearrest and renewed detention. Kong, 2021 WL 1109910 at *7-*8.

The court then rejected Kong's argument that his arrest contravened § 241.13(i)(2) because, in the court's judgment, there was "a significant likelihood that [Kong] may be removed in the reasonably foreseeable future." Id. at *8. In making this finding, the court did not ascertain whether ICE had made such a determination before arresting and re-detaining Kong.

This appeal followed.

**E. The Parties' Positions on Appeal**

In challenging the court's jurisdictional ruling, Kong acknowledges that the government's decision to move forward with his removal is a discretionary judgment not subject to review because of the jurisdictional bar of § 1252(g). He argues, however, that the actions he challenges -- all pertaining to his detention -- are distinct from the discretionary decision to execute his removal and that, accordingly, his claims fall outside the § 1252(g) jurisdictional bar. Specifically, he argues that § 1252(g) does not bar his challenge to the lawfulness of his detention. Here, Kong claims that the government lacked a valid

warrant and that the government, having previously determined that his removal was "not possible or practicable," failed to follow its own regulations requiring ICE to determine that, "on account of changed circumstances, . . . there [was] a significant likelihood that [Kong] may be removed in the reasonably foreseeable future." See 8 C.F.R. § 241.13(i)(2). He contends that, absent such an individualized finding, ICE lacked the legal authority to detain him and is therefore liable for false arrest and false imprisonment. His MCRA claim arose from ICE's alleged violation of its own regulations by failing to give him notice of the reasons for his detention and an opportunity to be heard concerning the propriety of detaining him.

The government, in opposition, insists that the court lacks jurisdiction to hear the case because Kong's detention stemmed from the decision to execute his removal order and, accordingly, his FTCA claims challenging that detention are foreclosed by § 1252(g). The government also argues that Kong's claims fail on their merits because Kong was arrested pursuant to a valid warrant of deportation.

**II.**

## A. The Scope of § 1252(g)

The Immigration and Nationality Act ("INA") includes various provisions restricting judicial review in immigration cases. The provision at issue here, 8 U.S.C. § 1252(g), states:

> Except as provided in this section and
> notwithstanding any other provision of law
> (statutory or nonstatutory), including
> section 2241 of title 28, or any other habeas
> corpus provision, and sections 1361 and 1651
> of such title, no court shall have
> jurisdiction to hear any cause or claim by or
> on behalf of any alien arising from the
> decision or action by the Attorney General to
> commence proceedings, adjudicate cases, or
> execute removal orders against any alien under
> this chapter.

Despite the seeming breadth of the statutory language, the Supreme Court has cautioned against reading the provision to preclude jurisdiction over all claims related to removal.

The Court first considered the scope of § 1252(g) in Reno, which involved an INS practice -- known as "deferred action" -- in which the INS would exercise its discretion to decline to remove a noncitizen for humanitarian reasons. See 525 U.S. at 482, 484. This practice led to litigation over the refusal to grant deferred action. Id. at 484-85. The Court held that § 1252(g) barred challenges to such refusals because Congress "directed" § 1252(g) "against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." Id. at 485 n.9.[4] The Court stated that "[t]here was good reason for

---

[4] The Court, however, stopped short of holding that selective prosecution claims regarding the government's refusal to grant deferred action were categorically barred by § 1252(g). See Reno, 525 U.S. at 491 ("[W]e need not rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome.").

Congress to focus special attention upon, and make special provision for, judicial review of the Attorney General's discrete acts of 'commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders' -- which represent the initiation or prosecution of various stages in the deportation process." Id. at 483. The Court contrasted decisions falling within these three discrete categories with the "many other decisions or actions that may be part of the deportation process," such as "the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order." Id. at 482.

In summarizing its narrow reading of § 1252(g), the Court declared that "[i]t is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." Id. This had to be the result, "[n]ot because Congress is too unpoetic to use synecdoche,[5] but because that literary device is incompatible with the need for precision in legislative drafting." Id.

_____

[5] Synecdoche refers to a literary device in which a part of something is used to represent the whole. See synecdoche, The Merriam Webster Dictionary (revised ed. 2022). For example, using the word "boot" to refer to soldiers ("we need to get boots on the ground") or "wheels" to refer to a car ("check out my new wheels").

More recently, in <u>Jennings</u> v. <u>Rodriguez</u>, 138 S. Ct. 830 (2018), the Court reaffirmed its narrow construction of § 1252(g), noting that <u>Reno</u> "did not interpret [the phrase "arising from" in § 1252(g)] to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General. Instead, [<u>Reno</u>] read the language to refer to just those three specific actions themselves." <u>Id.</u> at 841. However, the Court did not elaborate on which claims are outside the provision's scope even though they might "technically" arise from one of those three discrete actions.

**B. Kong's Claims**

In a but-for sense, Kong's claim of improper detention "arose from" the government's decision to execute his removal. The government re-detained Kong as it sought to arrange an interview with Cambodian officials with the goal of removing him to Cambodia. However, as noted, Supreme Court caselaw establishes that claims challenging administrative actions do not "arise from" the government's decision to "execute removal orders" within the meaning of § 1252(g) simply because the claims relate to that discretionary, prosecutorial decision in the "but for" causal sense. Our task, therefore, is to determine whether Kong's claims implicate ICE's discretionary decision to pursue his removal in the sense relevant to § 1252(g).

        Although we have not previously considered the meaning
of "arising from" in the specific context of § 1252(g), we are
guided by our reasoning in a previous case interpreting the same
phrase in a related subsection of the INA -- 8 U.S.C.
§ 1252(b)(9) -- to permit judicial consideration of collateral
challenges to the legality of a petitioner's detention.  See
Aguilar v. U.S. Immigr. & Customs Enf't Div. of the Dep't of
Homeland Sec., 510 F.3d 1 (1st Cir. 2007).  In Aguilar, a group of
noncitizens detained by the government sought immediate release
through a petition for habeas corpus and a complaint for
declaratory and injunctive relief.  Id. at 7.  The plaintiffs
subsequently filed an amended complaint, fashioned as a class
action, that withdrew their request for immediate release.  Id.
They alleged that ICE had violated their constitutional and
statutory rights in detaining them and that the district court had
both habeas and federal question jurisdiction over their claims.
See id. at 7-8.[6]  The district court, citing to § 1252(b)(9), held

_____

        [6] The noncitizens "alleged that ICE's actions had violated
certain of the [noncitizens'] constitutional and statutory rights,
including: (i) the right to be free from arbitrary, prolonged, and
indefinite detention; (ii) the right to a prompt bond hearing,
that is, one held in Massachusetts prior to any transfer; (iii)
the right to counsel; and (iv) the right of family integrity.  The
amended complaint further alleged that it was 'the established
policy and practice of the [government] to conduct large scale
'sweeps' or 'raids' in which large numbers of persons suspected of
being unlawfully present in the United States' are held 'at
facilities which are some distance from the site of arrest and
under conditions where access to counsel . . . is impracticable,

that it lacked subject-matter jurisdiction to hear the claims.
Id. at 7.  Section 1252(b)(9) directs claims to which it applies
through a particular administrative process, with review vested
exclusively in the Courts of Appeals.  Id.  On appeal, the
noncitizens argued that their claims lay beyond the reach of
§ 1252(b)(9)'s channeling requirements and thus could be heard by
a district court even though their claims had not been exhausted
before the administrative agency.  Id. at 7-9.

> Section 1252(b)(9) provides, in relevant part:
>
>> Judicial review of all questions of law and
>> fact . . . arising from any action taken or
>> proceeding brought to remove an alien from the
>> United States . . . shall be available only in
>> judicial review of a final order under this
>> section.  Except as otherwise provided in this
>> section, no court shall have jurisdiction, by
>> habeas corpus under section 2241 of title 28
>> or any other habeas corpus provision, . . . or
>> by any other provision of law (statutory or
>> nonstatutory), to review such an order or such
>> questions of law or fact.

8 U.S.C. § 1252(b)(9).  Noting that the phrase "arising from" is
not "infinitely elastic," we reasoned that -- despite the
provision's expansive language -- it does not reach "claims that
are independent of, or wholly collateral to, the removal process,"
Aguilar, 510 F.3d at 10-11, or that bear "only a remote or
attenuated connection to the removal of an alien," id. at 10.
Among such "collateral" claims, we explained, were claims seeking

---

if not impossible.'"  Aguilar, 510 F.3d at 7.

review of the legality of a petitioner's detention.  <u>Id.</u> at 10-11.

In so concluding, we cited the intent of Congress as set forth in the Conference Report accompanying the passage of the REAL ID Act of 2005, Pub. L. No. 109–13, § 106, 119 Stat. 302, 310-11, that amended the INA to include the language now found in § 1252(b)(9).  <u>See</u> H.R. Rep. No. 109-72, at 175 (2005) (Conf. Rep.).  The Report specified that nothing in the amendment would "preclude habeas review over challenges to detention that are independent of challenges to removal orders."  <u>Id.</u>  Instead, the Report noted, "the bill would eliminate habeas review only over challenges to removal orders."  <u>Id.</u>  In <u>Aguilar</u>, we noted that "[i]n line with [Congress's] prescription [in the Report], we have held that district courts retain jurisdiction over challenges to the legality of detention in the immigration context."  510 F.3d at 11 (citing <u>Hernandez</u> v. <u>Gonzales</u>, 424 F.3d 42, 42 (1st Cir. 2005) (holding that detention claims are independent of removal proceedings and, thus, not barred from district court jurisdiction by § 1252(b)(9)).  Hence, relying on this legislative history, we determined that § 1252(b)(9)'s instruction to consolidate all legal and factual questions "arising from any action taken or proceeding brought to remove an alien" in a petition for

review[7] "should not be read to preclude 'habeas review over challenges to detention.'" Id. We reached this decision even though § 1252(b)(9) explicitly applied to habeas jurisdiction. This reading, we reasoned, "is consistent with the wise presumption that Congress legislates with knowledge of longstanding rules of statutory construction. That presumption traditionally requires that there be clear and convincing evidence of legislative intent before restricting access to judicial review entirely." Id. at 11 (citation omitted).

The constitutional concerns and legislative history informing our interpretation of the phrase "arising from" in § 1252(b)(9) weigh even more heavily in the context of § 1252(g), which does not simply channel claims within its scope but entirely eliminates judicial review.[8] Before the amendments made by the REAL ID Act in 2005, § 1252(b)(9) and § 1252(g) did not directly address habeas jurisdiction, and noncitizens frequently brought

---

[7] A petition for review is the document filed by, or on behalf of, an individual seeking review of an agency decision in the Circuit Courts of Appeals. In the immigration context, a petition for review is filed to obtain review of a removal or exclusion decision issued by the Board of Immigration Appeals. See e.g., Perez-Trujillo v. Garland, 3 F.4th 10, 15 (1st Cir. 2021).

[8] In Aguilar, we noted the difference between these two provisions. We described § 1252(b)(9) as a channeling provision, not a claim-barring one like § 1252(g). 510 F.3d at 11. In other words, § 1252(b)(9), where applicable, only requires exhaustion of administrative procedures and the consolidation of claims for review. Id. In contrast, § 1252(g) precludes any review of the administrative decisions within its scope. Id. at 11 n.2.

habeas corpus petitions to seek review of removal decisions.  See,
e.g., INS v. St. Cyr, 533 U.S. 289, 313-14 (2001).  The 2005
amendments added language to § 1252(g) that explicitly applied the
statute's jurisdictional limitations to habeas cases: "including
section 2241 of title 28,[9] or any other habeas corpus provision."[10]
As we noted in Aguilar, however, the Conference Report accompanying
the 2005 amendments expressly stated that the amendments preserved
"habeas review over challenges to detention that are independent
of challenges to removal orders."  H.R. Rep. No. 109-72, at 175;
see Aguilar, 510 F.3d at 11.  Notably, this statement appeared in
the Report immediately after an extensive examination of Supreme
Court and circuit court precedent describing the kinds of
jurisdiction-stripping provisions that would not violate the right
to habeas corpus.  See H.R. Rep. No. 109-72 at 174-75.  This
careful review of precedent demonstrates Congress's attentiveness

---

[9] 28 U.S.C. § 2241 authorizes federal courts to grant the writ
of habeas corpus.  Habeas protections have been recognized by the
Court as fundamental to individual liberty.  See, e.g., Boumediene
v. Bush, 553 U.S. 723, 740-46 (2008).

[10] Of less relevance to this case, the statute also references
28 U.S.C. § 1361 and 28 U.S.C. § 1651.  Section 1361 gives courts
original jurisdiction of any action in the nature of mandamus to
compel an officer or employee of the United States to perform a
duty owed to a plaintiff.  Section 1651 gives courts the power to
issue writs necessary or appropriate in aid of their respective
jurisdictions and also allows courts to issue an alternative writ
or rule nisi within their jurisdiction.  By referencing these two
statutes, § 1252(g) further emphasizes the scope of its
jurisdictional bar.

to the constitutional limitations on withdrawing habeas relief from those seeking release from unlawful detention.

Hence, there is no way to read this legislative history as evincing "a clear statement of congressional intent to repeal habeas jurisdiction" over all detention claims. See St. Cyr, 533 U.S. at 298. To the contrary, § 1252(g) was passed with the understanding that collateral challenges to the legality of a petitioner's detention would not constitute "cause[s] or claim[s]" that "aris[e] from the decision or action by the Attorney General to . . . execute removal orders."

To the extent that the language in the Conference Report seems an insufficient basis to limit the scope of the jurisdictional bar of § 1252(g), we find additional support for that limitation in the judicial canon of constitutional avoidance. "'[I]t is a cardinal principle' of statutory interpretation . . . that when an Act of Congress raises 'a serious doubt' as to its constitutionality, 'this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" Zadvydas v. Davis, 533 U.S. 678, 689 (2001) (quoting Crowell v. Benson, 285 U.S. 22, 62 (1932)); cf. Almendarez-Torres v. United States, 523 U.S. 224, 238 (1998) (noting that congressional will is best reflected by construing a statute to avoid invalidation).

The Court has "read significant limitations into . . . immigration statutes in order to avoid their constitutional invalidation." Zadvydas, 533 U.S. at 689; see also United States v. Witkovich, 353 U.S. 194, 195, 202 (1957) (holding that government authority under a statute to require noncitizens to answer such questions "as the Attorney General may deem fit and proper" is limited to questions "reasonably calculated to keep the Attorney General advised regarding the continued availability for departure of aliens whose deportation is overdue"). For example, in Zadvydas, the Supreme Court considered a detention-related removal claim. There, the government claimed that an immigration statute, 8 U.S.C. § 1231(a)(6), gave the Attorney General exclusive and unreviewable power to determine why, when, and for how long a noncitizen could be detained beyond the ninety-day removal period immediately following the issuance of a removal order.[11] Id. at 688-689. The Court concluded that, even though § 1231(a)(6)'s plain language cohered with the government's expansive reading, courts retained jurisdiction over some challenges to post-removal-period detention. Id. at 688-89.

---

[11] Pursuant to statute, noncitizens must be held in custody up to ninety days after entry of a final removal order. See 8 U.S.C. § 1231(a). Detention after this ninety-day period is known as post-removal-period detention. See, e.g., Zadvydas, 533 U.S. at 687-89.

The Court also referred in passing to § 1252(g), observing that neither that statute nor other jurisdiction-limiting provisions deprived courts of jurisdiction over all such detention-related claims. See id. The Court recognized that noncitizens have liberty interests protected by the Constitution, and it noted that the government may detain noncitizens only "in certain special and narrow nonpunitive circumstances, where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." Id. at 690 (citation omitted) (internal quotation marks omitted). In the context of post-removal-order detention, these justifications are the twin goals of "'ensuring the appearance of aliens at future immigration proceedings' and '[p]reventing danger to the community'" during ICE's efforts to procure removal. Id. Continued detention is unconstitutional unless it serves these aims. See id. at 690-91. Ultimately, the Court allowed jurisdiction over the challenges to detention at issue in Zadvydas. In doing so, it made clear that jurisdiction-limiting and discretion-protecting immigration statutes, including § 1252(g), have limits that derive at least in part from constitutional principles. See id. at 690 (reasoning that the canon of constitutional avoidance indicates that the post-removal-period statute must not be read to permit indefinite, unreviewable detention).

Construing the "arising from" language of § 1252(g) to
bar all detention-related claims -- the effective result of the
government's desired interpretation -- would raise serious
constitutional concerns under the Suspension Clause.  Absent the
right to judicial review through a habeas petition, the government
could detain noncitizens indefinitely without needing to provide
a justification to anyone.  For instance, if Kong were still
detained and he brought a habeas challenge rather than an FTCA
challenge to his detention, construing the "arising from" language
of § 1252(g) to bar his habeas claim would leave him with no access
to the courts.  Section 1252(g) can be interpreted to avoid this
constitutional concern by allowing challenges to detentions where,
as here, a noncitizen does not attack the decision to execute the
removal order.  See Parra v. Perryman, 172 F.3d 954, 957 (7th Cir.
1999) (reasoning that § 1252(g) does not preclude review of all
challenges to detention because a noncitizen's claim "concern[ing]
detention . . . may be resolved without affecting pending
[removal] proceedings"); cf. Zadvydas, 533 U.S. at 690, 696-97;
St. Cyr, 533 U.S. at 300, 314.

Although Kong is pursuing his claims of unlawful
detention in an FTCA action rather than a habeas petition, that
fact does not broaden the scope of § 1252(g).  To the contrary,
the text of § 1252(g) cannot be interpreted differently depending
on whether a detention-based challenge is brought as a habeas or

FTCA claim. See Clark v. Martinez, 543 U.S. 371, 382 (2005) (statutory interpretation adopted to avoid constitutional concerns also applies in contexts not raising these concerns; a contrary view would "render every statute a chameleon, its meaning subject to change depending on the presence or absence of constitutional concerns in each individual case").

Here, Kong does not challenge the decision to try to execute his removal. Kong claims that his renewed detention in 2018 was unlawful because the government -- by relying on a decades-old warrant and failing to adhere to regulatory procedures -- neither offered nor proved any "special justification" that existed at that time to outweigh his "constitutionally protected interest in avoiding physical restraint." Zadvydas, 533 U.S. at 690 (quoting Kansas v. Hendricks, 521 U.S. 346, 356 (1997)). These assertions of illegal detention are plainly collateral to ICE's prosecutorial decision to execute Kong's removal -- which, as noted above, Kong does not challenge. Our conclusion that § 1252(g) does not bar judicial review of Kong's challenge to the lawfulness of his detention thus aligns with the Supreme Court's observation in Reno that there are "many other decisions or actions that may be part of the deportation process" that do not fall in the three discrete exercises of "prosecutorial discretion" covered by § 1252(g). 525 U.S. at 482, 489.

Our interpretation of § 1252(g) to preserve jurisdiction over challenges like Kong's to the legality of detention is supported by caselaw from other circuits. Recently, the Ninth Circuit considered whether a noncitizen's FTCA claim for false arrest and imprisonment, based on the government's failure to follow a court order, was barred by § 1252(g). See Arce v. United States, 899 F.3d 796 (9th Cir. 2018). There, ICE removed a noncitizen to Mexico in violation of a court-ordered stay of removal. Id. at 799. The government claimed that the challenge was barred by § 1252(g) because the removal, even if unlawful, arose from the government's decision to execute removal. Id. The court held that § 1252(g) did not bar the noncitizen's FTCA claim because the claim did not arise from the execution of removal but instead arose from the government's unlawful removal of the plaintiff noncitizen in violation of a stay order. Id. at 800; see also Madu v. Att'y Gen., 470 F.3d 1362, 1368 (11th Cir. 2006) (holding that a challenge to legality of detention is distinct from a challenge to the government's discretionary decision to execute a removal order and thus not barred by § 1252(g)); Garcia v. Att'y Gen., 553 F.3d 724, 729 (3d Cir. 2009) (holding § 1252(g)'s jurisdictional bar does not apply when a petitioner "is not challenging the discretionary decision to commence proceedings, but is challenging the very authority to commence those proceedings"). Likewise, Kong's FTCA claim does not arise

from the discretionary decision to execute removal but instead arises from the government's alleged violations of law in arresting Kong without a relevant warrant and in failing to abide by its own regulations.

Finally, this case does not involve a challenge to the kind of brief detentions that in certain circumstances may implicate § 1252(g)'s jurisdictional bar. In Tazu v. Att'y Gen., 975 F.3d 292 (3d Cir. 2020), the Third Circuit held that § 1252(g) barred judicial review of a challenge to detention where a noncitizen was detained by ICE after his travel documents were secured and ICE was certain it would deport him to Bangladesh. Id. at 297-99. The court held that judicial review was barred because the challenge was to "brief door-to-plane detention[s]" that are "integral to the act of 'execut[ing] [a] removal order[].'" Id. at 298-99. In contrast, Kong's detention lasted for over fifty days and occurred before travel documents were secured, before deportation was certain, and allegedly without a valid warrant or any determination that his removal was likely in the reasonably foreseeable future.

### III.

Because we conclude that the district court has jurisdiction over Kong's claims, we could simply remand the case without further comment for the district court to consider the merits of each claim. However, despite dismissing Kong's action

based solely on a lack of jurisdiction, the district court -
- without reaching a holding on the merits -- offered its view on
problems with Kong's false arrest and false imprisonment claims.
It did not comment on the merits of his MCRA claim.

We do not intend to fully address the merits of Kong's
claims here on an incomplete record. However, it would be wasteful
if we did not exercise our discretion to address here two
questionable conclusions of the district court on the merits of
Kong's claims, only to address them later in the context of another
appeal if the court were to deny Kong's claims on these same
inappropriate grounds.

The district court gave two primary reasons for
concluding that the facts of this case could not support false
arrest and false imprisonment claims: (1) Kong was arrested and
detained based on a valid warrant from 1996, and (2) his removal
was reasonably foreseeable under 8 C.F.R. § 241.13(i)(2). Neither
rationale is supportable on the grounds stated by the district
court.

**A. The 1996 Warrant**

As noted above, a deportation warrant for Kong was issued
in 1996 at the time he was ordered deported to Cambodia. His
deportation was delayed because of Cambodia's refusal to accept
him. The government then determined that his release was no longer

significantly likely in the reasonably foreseeable future, so it released him from detainment under supervision.

In concluding that Kong's arrest in 2018 was justified by the initial 1996 warrant, the district court relied almost entirely on the Ninth Circuit's 1954 decision in Spector v. Landon to support its position. See 209 F.2d 481. That reliance is problematic. Spector is an old, out-of-circuit precedent with internal inconsistencies. The case involved a noncitizen, Spector, who was subject to an order of deportation initially issued by the government in 1930. Id. at 482. By the 1950s Spector had filed suit to stop the government from trying to deport him under the authority of that initial deportation order. Id. at 481-82. The Spector court begins its decision by stating that the case is about "an outstanding warrant for the deportation of appellant." Id. at 481. Yet in that same paragraph it describes the issue as whether a "deportation order had spent its force or become *functio officio* by virtue of unexcused lapse of time." See id. at 481-82 (emphasis added). Later in the opinion, the court again switches back and forth between the terms "warrant" and "order" in its reasoning. See id. at 482. The concepts of a deportation order and a deportation warrant cannot be conflated. The deportation order authorizes removal from the country. The warrant authorizes an arrest to effect removal. Compare, e.g., 8 C.F.R. § 241.1 with 8 C.F.R. § 241.2.

Read as a whole, the issue at the heart of Spector appears to be whether a deportation order ever expires, not a deportation warrant. The court asks repeatedly whether the government loses the ability to deport Spector due to the passage of time, not whether it loses the ability to arrest Spector in order to deport him. See, e.g., Spector, 209 F.2d at 482 (noting that in a prior case the court had held that a person need merely be freed from further imprisonment when "the government fails to execute the order of deportation") (quoting Caranica v. Nagle, 28 F.2d 955, 957 (9th Cir. 1928)) (emphasis added); id. at 482 (stating that the government here "appears" to have been "diligent in its attempt to effect deportation"); id. at 482-83 (commenting that "the delay in effecting appellant's deportation operated to his advantage"); id. at 483 (pointing out that the Supreme Court in an earlier iteration of Spector had reserved the question of whether a statute must be declared unconstitutional since the statute "affords a defendant no opportunity to have the court which tries him pass on the validity of the order of deportation") (quoting United States v. Spector, 343 U.S. 169, 172 (1952)) (emphasis added).

Not surprisingly, Ninth Circuit decisions citing Spector have recognized that it is about a deportation order, and they cite it to support the proposition that the validity of a deportation order, not a deportation warrant, does not expire over

time. See, e.g., Kim Ho Ma v. Ashcroft, 257 F.3d 1095, 1113 (9th Cir. 2001) (describing Spector as rejecting the argument that "as a result of the passage of time the deportation order was no longer valid") (emphasis added); Whetstone v. INS, 561 F.2d 1303, 1304 (9th Cir. 1977) (citing Spector for the proposition that "[a] deportation order does not become invalid . . . through the mere lapse of time") (emphasis added); United States v. Dekermenjian, 508 F.2d 812, 814 (9th Cir. 1974) (citing Spector for the proposition that a "deportation [o]rder" is not invalidated by "delay in its execution") (emphasis added); Cao v. INS, 189 F. Supp. 2d 1082, 1086 n.4 (S.D. Cal. 2001) (stating that Spector "held an alien ordered deported but released on bond for twenty-four years was still subject to a valid order of removal") (emphasis added).

Given all that is problematic about Spector as a precedent, the district court should reconsider its usefulness in assessing the validity of Kong's deportation warrant.

## B. Regulatory Requirements of § 241.13(i)(2)

ICE's decision to re-detain a noncitizen like Kong who has been granted supervised release is governed by ICE's own regulation requiring (1) an individualized determination (2) by ICE that, (3) based on changed circumstances, (4) removal has become significantly likely in the reasonably foreseeable future.

See 8 C.F.R. § 241.13(i)(2).[12]  The district court erred by making the foreseeability determination itself.  Without assessing whether ICE had made the required finding, the court declared that, "[b]ased on all the facts at the time he was arrested, there was 'a significant likelihood that [Kong] may be removed in the reasonably foreseeable future."  Kong, 2021 WL 1109910 at *8 (citing 8 C.F.R. § 241.13(i)(2)).  The plain language of the regulation, however, does not allow a court in the first instance

_____

[12]  Detention and executing removal go hand-in-hand when a noncitizen is first ordered removed because governing regulations require the detention of a noncitizen for up to ninety days once a removal order becomes final so that the government may carry out the noncitizen's removal.  See 8 U.S.C. § 1231(a)(1)-(2); see also Zadvydas, 533 U.S. at 683 (upholding this ninety-day detention period following a removal order).  However, the connection between executing a removal order and detaining a noncitizen unravels if the noncitizen is not removed within that ninety-day window, especially when, as in this case, the noncitizen has been released with supervision.  See 8 U.S.C. § 1231(a)(3), (6) (statutory supervised-release provisions).  Indeed, when "there is no significant likelihood that [a noncitizen being detained pending removal] may be removed in the reasonably foreseeable future," arrangements for release "shall promptly" be made absent "special circumstances justifying continued detention," 8 C.F.R. § 241.13(g)(1), and once a noncitizen has been granted supervised release, that release can only be revoked upon a showing that because of changed circumstances there is now a "significant likelihood that the [noncitizen] will be removed in the reasonably foreseeable future."  8 C.F.R. § 241.13(i)(2).

Here, the government initially argued that Kong's detention was mandatory, and thus lawful, because 8 U.S.C. § 1231(a)(1)(A) provides mandatory detention of up to ninety days while the government attempts to effectuate a removal order.  However, as the government later acknowledged in a separate filing, that provision does not apply to Kong's detention, and detaining him was thus not mandatory.

to make the required individualized finding.  To the extent ICE claims that it made such a determination, the court should review that claim in light of the regulations instructing ICE on how it should make such a determination.  See 8 C.F.R. §§ 241.13(f), (i)(2).[13]

## IV. CONCLUSION

We hold that § 1252(g)'s jurisdictional bar for claims "arising from" the government's decision to "execute removal orders" does not preclude jurisdiction over Kong's challenges to the legality of his detention.  Thus, we reverse the district court's dismissal under Federal Rule of Civil Procedure 12(b)(1) of Kong's FTCA claims for false arrest, false imprisonment, and a violation of the MCRA, all based on ICE's alleged illegal detention of him, and remand the case for further proceedings.

So ordered.

---

[13] Section 241.13 governs how ICE should determine whether there is a significant likelihood of removing a noncitizen in the reasonably foreseeable future.  Subsection (f) details several factors that ICE must consider in making the foreseeability inquiry.  See 8 C.F.R. § 241.13(f) ("[ICE's Headquarters Post-order Detention Unit] shall consider all the facts of the case including, but not limited to, the history of the alien's efforts to comply with the order of removal, the history of [ICE]'s efforts to remove aliens to the country in question or to third countries, including the ongoing nature of [ICE]'s efforts to remove this alien and the alien's assistance with those efforts, the reasonably foreseeable results of those efforts, and the views of the Department of State regarding the prospects for removal of aliens to the country or countries in question.").  Subsection (i) applies that reasonable foreseeability test to determining when a noncitizen on supervised release can be re-detained.  See § 241.13(i)(2).